**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| WEISS MULTI-STRATEGY ADVISERS LLC, *et al.,* | Case No. 24-10743 (MG) |
| Debtors. | Chapter 11 |
| GWA, LLC, WEISS MULTI-STRATEGY ADVISERS LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC, and WEISS MULTI-STRATEGY FUNDS LLC, | Adv. Pro. No. 24-01350 (MG) |
| Plaintiffs, | |
| vs. | |
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART JEFFERIES STRATEGIC INVESTMENTS, LLC'S AND LEUCADIA ASSET MANAGEMENT HOLDINGS LLC'S PARTIAL MOTION TO DISMISS**

*A P P E A R A N C E S :*

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for the Debtors*
200 West 41st Street, 17th Floor
New York, New York 10036
By:     Tracy L. Klestadt, Esq.
        John E. Jureller, Jr, Esq.
        Lauren C. Kiss, Esq.
        Stephanie R. Sweeney, Esq.

HERBERT SMITH FREEHILLS NEW YORK LLP
*Attorneys for Jefferies Strategic Investments, LLC,*
*Leucadia Asset Management Holdings LLC, and Jefferies LLC*
200 Park Avenue
New York, New York 10166
By:    Scott S. Balber, Esq.
       Michael P. Jones, Esq.
       Daniel Gomez, Esq.

**I.    BACKGROUND** ........................................................................................................... **5**

A.   Overview of the Debtors' Businesses .................................................................... 5

B.   Debtors' Prepetition Agreements with the Jefferies Entities ............................... 6

   1.   Strategic Relationship Agreement and Related Agreements ........................... 7

   2.   Note Purchase Agreement and Notes ............................................................... 8

   3.   The Initial Forbearance Agreements & $17 Million in Payments .................. 11

      a.   The January 2022 Initial Forbearance Agreement and $15 Million in Payments .. 11

      b.   The September 2022 Initial Forbearance Agreement ............................. 13

      c.   The July 2023 Initial Forbearance Agreement and the $2 Million Payment .......... 15

C.   The Notice of Optional Redemption ...................................................................... 16

D.   Debtors' Payment of Bonuses and Signing of the 2024 Forbearance Agreement ........... 17

E.   The 2024 Forbearance Agreement ......................................................................... 19

F.   OGI's $3 Million Payment to JSI ........................................................................... 22

G.   Commencement of the Chapter 11 Cases .............................................................. 23

H.   The Adversary Proceeding...................................................................................... 23

I.    The Motion............................................................................................................... 25

J.    The Debtors' Opposition......................................................................................... 27

K.   The Jefferies Entities' Reply .................................................................................. 29

**II.   LEGAL STANDARD** ................................................................................................. **30**

**III.  DISCUSSION** ............................................................................................................ **32**

A.   Validity and Binding Nature of the 2024 Forbearance Agreement ..................... 32

   1.   Rescission of the 2024 Forbearance Agreement as a Product of Duress ...................... 32

      a.   Wrongful Threats ......................................................................................... 35

      b.   Threats Precluded the Exercise of Free Will ........................................... 41

   2.   Null and Void for Lack of Consideration, Intent to Comply, and Countersignature ..... 43

      a.   Lack of Consideration.................................................................................. 43

      b.   Lack of Intent to Comply............................................................................. 46

      c.   Lack of Countersignature............................................................................ 48

    3.   Counts VI and VII ................................................................................ 50

B.  Avoidance of the 2024 Forbearance Agreement and the Security Interests ................... 50

    1.   Avoidance of the 2024 Forbearance Agreement ............................................. 50

        a.    Preferential Transfer Pursuant to 11 U.S.C. § 547(b) ............................................. 50

        b.    Fraudulent Transfer and Obligation Pursuant to 11 U.S.C. § 548(a)(1)(B) ........... 58

    2.   Avoidance of the Security Interests and Guarantees as a Fraudulent Transfers and Obligations Pursuant to 11 U.S.C. § 548(a)(1)(B) .................................................. 62

    3.   Claims Seeking Contingent Relief ................................................................. 64

        a.    Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551 ........................... 64

        b.    Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)....... 65

    4.   Counts I, II, III, IV, and V .............................................................................. 66

C.  Avoidance of the Alleged Avoidable Transfers ................................................................ 67

    1.   The $3 Million Alleged Avoidable Transfer as a Preferential Transfer Pursuant to 11 U.S.C. § 547(b) ............................................................................................................. 67

    2.   The $20 Million in Alleged Avoidable Transfers as Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B) .......................................................................................... 69

    3.   Claims Seeking Contingent Relief ................................................................. 72

        a.    Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551 ........................... 72

        b.    Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)....... 72

    4.   Counts VIII, IX, X, and XI ............................................................................. 73

D.  Disallowance of the Jefferies Entities' Claims ................................................................. 73

    1.   Count XII ........................................................................................................ 74

E.  Leave to Further Amend .................................................................................................... 74

**IV.   CONCLUSION ......................................................................................................... 76**

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 19) of

Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC

("LAM Holdings," and with JSI, the "Jefferies Entities" or "Defendants").[1]  The Motion seeks

---

[1]      Unless otherwise indicated, all docket references shall refer to docket entries in the above-captioned adversary proceeding.

partial dismissal of the *First Amended Complaint*[2] (the "FAC," ECF Doc. # 13-2) filed by GWA, LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSO"), and Weiss Multi-Strategy Funds LLC ("WMSF" and, together with GWA, WMSA, OGI, and WSO, the "Debtors" or "Plaintiffs") in the above-captioned adversary proceeding (the "Adversary Proceeding") pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.

Annexed to the Motion is a supporting memorandum of law (the "Supporting Memorandum," ECF Doc. # 19-1). While no supporting declaration was filed with the Motion, the Jefferies Entities previously filed a partial motion to dismiss in connection with the first iteration of the adversary complaint. In support of that motion, the Jefferies Entities filed the supporting declaration of Scott S. Balber, partner at Herbert Smith Freehills New York LLP (the "Balber Declaration," ECF Doc. # 7-2). The *Notice of Jefferies Strategic Investments, LLC's and Leucadia Asset Management Holdings LLC's Partial Motion to Dismiss* (ECF Doc. # 19 at 1–2) indicates that the Jefferies Entities seek partial dismissal of the FAC in reliance upon, among other things, the Balber Declaration and the exhibits attached thereto.

On August 6, 2024, the Debtors filed an opposition (the "Opposition Brief," ECF Doc. # 20) to the Motion. In support of the Opposition, the Debtors filed the supporting declaration of John E. Jureller, Jr., a member of law firm Klestadt Winters Jureller Southard & Stevens, LLP (the "Jureller Declaration," ECF Doc. # 21). On August 16, 2024, the Jefferies Entities filed a reply brief (the "Reply Brief," ECF Doc. # 22) in further support of the Motion.

On September 11, 2024, the Court held a hearing on the Motion.

---

[2]     On July 15, 2024, the Debtors and the Jefferies Entities entered into a stipulation pursuant to which the Debtors were granted leave to file the FAC, which the Court so-ordered the next day. (*See* ECF Doc. # 18.)

For the reasons discussed below, the Court **GRANTS** the Motion in part and **DENIES** the Motion in part as follows:

- Counts I, II, VIII, IX, X, and XI are dismissed in their entirety.

- Count III is dismissed except to the extent it asserts a preference claim that seeks to avoid the granting of security interests under the 2024 Forbearance Agreement (defined below) pursuant to 11 U.S.C. § 547(b).

- Counts IV and V are dismissed except to the extent they relate to the avoidance of security interests and guarantees arising under the 2024 Forbearance Agreement as preferential transfers under 11 U.S.C. § 547(b).

- Count VI is dismissed except to the extent such claim is asserted against OGI, WSO, and WMSF as is and WSMA with respect to the Jefferies Entities' threats of clawback litigation and freezing of bank accounts.

- Count VII is dismissed except to the extent it seeks a judgment that the 2024 Forbearance Agreement is null and void for lack of consideration as to OGI, WSO, and WMSF.

- Count XII survives dismissal in its entirety.

The Debtors may amend the FAC in accordance with the Court's ruling.

## I.    BACKGROUND[3]

### A.  Overview of the Debtors' Businesses

Each of the Debtors is "part of a constellation of financial services companies which, at the direction of George A. Weiss . . . operated as a hedge fund since approximately 1978." (Supporting Memorandum ¶ 10.)  At the helm is GWA, the holding company and parent—in whole or in part—of the other Debtors.  (*Declaration of Pierce Archer, Senior Vice President and Chief Operating Officer of the Debtors Pursuant to Local Bankruptcy Rule 1007-2 in Support of Chapter 11 Petitions* (the "Initial Debtors First Day Declaration"), Case No. 24-10743, ECF Doc. # 6 ¶ 12.)

---

[3]    The facts set forth herein are based on the "Statement of Alleged Facts" in the Jefferies Entities' Supporting Memorandum, which itself is primarily predicated on facts set forth in the FAC.  The Jefferies Entities indicate that, "[f]or purposes of this [M]otion only, the Jefferies Entities assume, but do not admit, the truth of all well-pleaded factual allegations contained in the FAC."  (Supporting Memorandum at 4 n.3.)

Meanwhile, the remaining Debtors served in a variety of roles. Historically, WMSA acted as a discretionary investment adviser to a number of private investment funds organized by WMSA, a mutual fund, and an Undertakings for Collective Investment in Transferable Securities fund. (*Id.* ¶ 18.) WMSA also advised managed accounts owned by institutional investors over which it exercised sole investment discretion. (*Id.*) OGI was an investment company that contained GWA's excess capital while WSO provided administrative services for certain investment funds and has been in the process of liquidating its assets since 2016. (*Id.* ¶¶ 20, 22.)

Lastly, WMSF, formed in 2003 under the name Weiss Investment Management Services LLC, was a "limited purpose captive broker-dealer whose sole purpose was to solicit investors for the investment funds managed by WMSA, its . . . affiliate." (*Declaration of Michele M. Lanzoni, Chief Financial Officer of Weiss Multi-Strategy Funds LLC, Pursuant to Local Bankruptcy Rule 1007-2* ("WMSF First Day Declaration"), Case No. 24-11075, ECF Doc. # 2 ¶ 11.) WMSF, established for regulatory purposes, never held customer assets nor carried customer accounts for any clients. (*Id.*; Supporting Memorandum ¶ 11.) On June 4, 2024, the U.S. Securities and Exchange Commission approved WMSF's withdrawal and termination as a broker-dealer. (FAC ¶ 26.)

**B. Debtors' Prepetition Agreements with the Jefferies Entities**

From 2018 to 2022, GWA executed several contracts with the Jefferies Entities, through which it obtained financial support for the Debtors' business operations in exchange for certain payment obligations. (Supporting Memorandum ¶ 12.) These agreements include: (i) a strategic relationship agreement (the "Strategic Relationship Agreement," ECF Doc. # 7-3) and a related investment management agreement (the "IMA"); (ii) two note purchase agreements (collectively, the "Note Purchase Agreements"); and (iii) certain forbearance agreements.

The Jeffries Entities state that, as of the commencement of the Adversary Proceeding,

GWA owed to LAM Holdings approximately $52.5 million under the Strategic Relationship

Agreement and more than $50 million, plus interest, under certain notes issued pursuant to the

Note Purchase Agreements (each, a "Note," and collectively, the "Notes").  (*Id.* ¶¶ 17–18.)

Each of these agreements is discussed in turn.

### 1. Strategic Relationship Agreement and Related Agreements

On May 1, 2018, LAM Holdings' predecessor and GWA entered into the Strategic

Relationship Agreement pursuant to which LAM Holdings obtained a "profit equity interest" in

GWA.  (*Id.* ¶ 13.)  That interest entitled LAM Holdings to a share of the Debtors' revenue as an

unsecured creditor.[4]  (*Id.*; FAC ¶ 40 (representing that, at all relevant times, LAM Holdings was

an unsecured creditor under the Strategic Relationship Agreement).)  In addition, none of

WMSA, OGI, WSO, and WMSF (i) were parties to or guarantors of obligations arising

thereunder; (ii) granted any security interests or provided any offset; or (iii) received any

consideration.  (*Id.* ¶ 41; *see also id.* at 16 n.3 (stating that OGI and WSO were not signatories to

nor guarantors of the Strategic Relationship Agreement).)

In connection with the Strategic Relationship Agreement, WMSA and JSI also entered

into the Investment Management Agreement, dated May 1, 2018 (the "IMA").  (*Id.* ¶ 31.)

---

[4]     Note that, with respect to amounts GWA owes to LAM Holdings, the Jeffries Entities rely on the figure
GWA provides in its court filings, which is higher than the figure in the Jeffries Entities' own records.  (*Compare*
Supporting Memorandum ¶ 17 (citing *Chapter 11 or Chapter 9 Cases Non-Individual: List of Creditors Who Have
20 Largest Unsecured Claims and Are Not Insiders*, Case No. 24-10743, ECF Doc. # 12 at 2, which specifies an
amount of $52,473,259.00), *with Declaration of Nicholas Daraviras in Support of Jefferies Strategic Investments,
LLC and Leucadia Asset Management Holdings LLC Motion for Conversion of the Debtors' Cases to Chapter 7
Pursuant to 11 U.S.C. § 1112(b)*, Case No. 24-10743, ECF Doc. # 20-3 ¶ 4 (stating that the Jefferies Entities'
records reflect that GWA owes LAM Holdings $50,902,392.00 in revenue sharing fees on account of the Strategic
Relationship Agreement).)

2.  Note Purchase Agreement and Notes

GWA, WMSA, and JSI, as successor to JFG Funding LLC, entered into the two Note

Purchase Agreements on December 3, 2019 (the "2019 Note Purchase Agreement," ECF Doc.

# 21-1) and September 21, 2022 (the "2022 Note Purchase Agreement," ECF Doc. # 21-4).  (*Id.*

¶¶ 34, 36.)  Pursuant to the Note Purchase Agreements, GWA issued the Notes, which JSI agreed

to purchase, as follows: (i) a $31,250,000 Note dated December 3, 2019 issued pursuant to the

2019 Note Purchase Agreement (the "December 2019 Note," ECF Doc. # 21-2) and maturing on

December 3, 2024; (ii) a $18,750,000 Note dated January 13, 2020 issued pursuant to the 2019

Note Purchase Agreement (the "January 2020 Note," ECF Doc. # 21-3) and maturing on January

13, 2025; and (iii) a $3,000,000 Note dated September 21, 2022 issued pursuant to the 2022 Note

Purchase Agreement (the "September 2022 Note," ECF Doc. # 21-5) and maturing on September

21, 2029.  (*Id.* ¶¶ 35, 37; *see also* Supporting Memorandum ¶ 14 ("JSI agreed to purchase $53

million in notes . . . issued by GWA under two 'Note Purchase Agreements'.").)

The Debtors represent that, under the Note Purchase Agreements, JSI was at all relevant

times an unsecured creditor of GWA and WMSA.  (FAC ¶ 38.)  There were no guarantees,

security interests, or rights of setoff under the Note Purchase Agreements or the Notes.  (*Id.*)  In

particular, none of OGI, WSO, and WMSF were parties to the Note Purchase Agreements, the

Notes, or any other related agreement with the Jefferies Entities and none guaranteed, granted a

security interest, provided for any offset, or received any consideration in connection with the

foregoing.  (*Id.* ¶ 39.)

Notably, sections 7.2 and 7.3 of the Note Purchase Agreements provide certain

redemption rights with respect to the Notes.  (*See* Supporting Memorandum ¶¶ 15–16.)

Specifically, section 7.2 of each Note Purchase Agreement grants GWA and JSI certain optional

8

redemption rights as to the applicable Notes and is virtually identical to the other.  Section 7.2 of

the 2019 Note Purchase Agreement provides:

> Each of [GWA] and [JSI] shall have the right to redeem each Note, in whole
> but not in part, on each applicable Optional Redemption Date (an "Optional
> Redemption") by at least 10 calendar days' prior written notice to the other
> party prior to the applicable Optional Redemption Date,[5] and [GWA] will
> pay [JSI] the Redemption Payment on the applicable Optional Redemption
> Date and the applicable Note will cease to be outstanding upon payment in
> full thereof.

(2019 Note Purchase Agreement § 7.2 (granting with respect to the December 2019 Note and

January 2020 Note); *see also* 2022 Note Purchase Agreement § 7.2 (granting the same with

respect to the September 2022 Note).)

Meanwhile, section 7.3 of the Note Purchase Agreements provides JSI with a "trigger

redemption" right as to the applicable Notes.  Section 7.3 of the 2019 Note Purchase Agreement

states:

> [JSI] shall have the right to redeem the Notes, in whole but not in part, at
> any time following the occurrence of either (a) Cause by prior written notice
> to [GWA] at any time or (b) a Members Equity Event by at least 10 calendar
> days' prior written notice to the Company (any such redemption, a "Trigger
> Redemption").   If the Notes are redeemed pursuant to a Trigger
> Redemption, [GWA] will pay [JSI] the Redemption Payment on the date
> specified by [JSI] in the applicable notice (the "Trigger Redemption Date")
> and the Notes will cease to be outstanding upon payment in full thereof.

(2019 Note Purchase Agreement § 7.3 (granting with respect to the December 2019 Note and

January 2020 Note); *see also* 2022 Note Purchase Agreement § 7.3 (granting the same with

---

[5]     With respect to the December 2019 Note, the Optional Redemption Date is defined to be "monthly, on the
last calendar day of each month, beginning the third anniversary of the December Closing."  (2019 Note Purchase
Agreement at A-4).  As for the January 2020 Note, such date is defined to be "monthly, on the last calendar day of
each month, beginning the third anniversary of the January Closing."  (*Id.*)  Finally, as for the September 2022 Note,
this date is defined to be "monthly, on the last calendar day of each month."  (2022 Note Purchase Agreement at A-
3.)

respect to the September 2022 Note).)[6]  Under the Note Purchase Agreements, a "Members

Equity Event" is deemed to have occurred when the "member's equity [in GWA]" is "equal to or

less than $10 million," calculated as if the applicable Notes had been redeemed in full as of such

day.  (2019 Note Purchase Agreement at A-4 (with respect to the December 2019 and January

2020 Notes only); 2022 Note Purchase Agreement at A-3 (with respect to all the Notes).)

In the event of an Optional Redemption or a Trigger Redemption, amounts due under the

Notes—computed in the manner set forth in the applicable Note Purchase Agreement—"shall

become due and payable" on the applicable Optional Redemption Date or Trigger Redemption

Date.  (2019 Note Purchase Agreement § 7.4; 2022 Note Purchase Agreement § 7.4.)

The Jefferies Entities maintain that JSI had the "right to redeem the Notes at its option

beginning in December 2022 and January 2023, so long as it provided at least 10 calendar days'

notice" pursuant to section 7.2 of the Note Purchase Agreements.  (Supporting Memorandum

¶ 15.)  At the hearing held on September 11, 2024, Debtors' counsel acknowledged that the

Jefferies Entities provided such notice, which triggered the Optional Redemption Date.  (*See*

Sept. 11, 2024 Hr'g Tr. at 47:12–19 (acknowledging to the Court that the Debtors received such

notice as set forth in paragraph 53 of the FAC).)  The Jefferies Entities also contend that,

pursuant to section 7.3 of the Note Purchase Agreements, JSI possessed the right to redeem the

Notes if GWA members' equity in GWA dropped to less than $10 million, which occurred in

late 2021.  (Supporting Memorandum ¶¶ 16, 21.)

---

[6]     Section 7.3 of the 2022 Note Purchase Agreement contains language notwithstanding the Table of Contents
that indicates that section 7.3 is "[RESERVED]."  Section 17.3(d) of the 2022 Note Purchase Agreement provides
that "all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this
Agreement."  (2022 Note Purchase Agreement § 17.3(d).)

3.   The Initial Forbearance Agreements & $17 Million in Payments

On January 1, 2022, September 21, 2022, and July 25, 2023, JSI, on the one hand, and

GWA and WMSA, on the other hand, entered into certain forbearance letters (each, an "Initial

Forbearance Agreement," and collectively, the "Initial Forbearance Agreements"), pursuant to

which JSI agreed to forbear from exercising certain remedies subject to certain conditions.  (FAC

¶¶ 43, 47, 50.)  Under each of the Initial Forbearance Agreements, the Debtors submit that GWA

and WMSA continued to operate in the ordinary course of business, including, among other

things, paying ordinary course obligations such as bimonthly salary and year-end

bonus/compensation.  (*Id.* ¶ 51.)  Indeed, the majority of the employees were paid their annual

compensation at year-end in February, which the Debtors represent was in accordance with

"industry standard."  (*Id.*)  At no point, the Debtors emphasize, was the payment of employees'

annual compensation and year-end bonuses prohibited under the Note Purchase Agreements "or

any of the Debtors' agreements with Defendants."  (*Id.*)  Indeed, the Debtors made "similar

ordinary course compensation and bonus payments to their employees each year, in February . . .

from 2020 through 2024."  (*Id.* ¶ 57.)

Each of the Initial Forbearance Agreements is governed by New York law.  (*See* January

2022 Initial Forbearance Agreement, ECF Doc. # 21-6 ¶ 6; September 2022 Initial Forbearance

Agreement, ECF Doc. # 21-7 ¶ 5; July 2023 Initial Forbearance Agreement ECF Doc. # 21-8 ¶

5.)

a.   *The January 2022 Initial Forbearance Agreement and $15 Million in
        Payments*

The January 2022 Initial Forbearance Agreement, which applied solely to the 2019 Note

Purchase Agreement and the December 2019 and January 2020 Notes, provided, in relevant part,

that:

> Notwithstanding (a) anything to the contrary in section 7.3(b) of the [2019]
> Note Purchase Agreement and (b) the occurrence and continuation of a
> Members Equity Event, ***JSI hereby agrees that it will not exercise its rights
> to affect a Trigger Redemption prior to July 1, 2023*** . . . provided that the
> [December 2019 and January 2020 Notes] shall be repaid by [GWA] in
> accordance with the following schedule . . . (i) at least $5,000,000 aggregate
> principal amount thereof, on or prior to April 30, 2022, (ii) an additional
> aggregate principal amount thereof of at least $10,000,000, on or prior to
> July 31, 2022, and (iii) an additional aggregate principal amount thereof of
> at least $20,000,000, on or prior to July 1, 2023.  At [GWA's] sole option,
> it can accelerate or make additional payments of principal at any time.  For
> the avoidance of doubt, if [GWA] shall cease and JSI shall thereafter have
> the right to redeem the [December 2019 and January 2020 Notes] pursuant
> to Section 7.3(b) of the [2019] Note Purchase Agreement.

(January 2022 Initial Forbearance Agreement ¶ 1 (emphasis added).)

As consideration for the foregoing, the parties agreed to amend the Strategic Relationship Agreement to clarify the relationship between LAM Holdings, successor-in-interest to LAM Holding LLC, and GWA.  (*Id.* ¶¶ 1–2; *see also id.*, Ex. A at 2 (amending the Strategic Relationship Agreement to provide that LAM Holdings "shall not be deemed for any purpose . . . to be a partner or joint venturer, nor to be involved in any syndicate, with [GWA] or any of its Affiliates").)  The parties "acknowledge[d] and agree[d] that they have received adequate and sufficient consideration for entering into [the January 2022 Initial Forbearance Agreement]." (*Id.* ¶ 5.)

Additionally, the January 2022 Initial Forbearance Agreement included a reservation of rights that made clear that nothing therein "extinguish[ed] the obligations for the payment of money outstanding under the Notes," among other things.  (*Id.* ¶ 4.)  Moreover, the agreement further provided that nothing therein should be construed as (i) a "substitution or novation of the obligations outstanding on the Notes or under the [2019] Note Purchase Agreement or any instruments, documents and agreements securing the same," or (ii) a "release or other discharge

12

of [GWA] or its affiliates from any of its obligations and liabilities under the Note or the [2019]

Note Purchase Agreement." (*Id.*)

In accordance with the terms of the January 2022 Initial Forbearance Agreement, GWA

made payments to JSI in the amounts of $5 million on April 29, 2022 and $10 million on July

29, 2022. (*See* FAC ¶ 44; *id.*, Schedule 1.)  The Debtors characterized the January 2022 Initial

Forbearance Agreement as a "unilateral renegotiation of the agreed Maturity Dates under these

Notes by Defendants." (*Id.* ¶ 44.)  Specifically, they allege that (i) GWA was "coerced to pay JSI

the sum of $5,000,000 on April 29, 2022 and $10,000,000 on July 29, 2022"; (ii) even if they

were applied to obligations under the Notes, they were arbitrarily required to be paid

approximately 3 years before maturity due to an "immaterial covenant default"; (iii) GWA and

WMSA did not receive reasonable equivalent value as there was "no clear right to declare a

Trigger Redemption from which JSI agreed to forbear"; and (iv) the "modification under the

Notes as a result of the January 2022 Initial Forbearance Agreement" occurred when GWA and

WMSA were insolvent or made insolvent, or were otherwise caused to incur a debt "beyond their

ability to pay as such debts matured." (*Id.*; *see also id.* ¶ 45 (detailing the Debtors' first quarter

financials in 2022 that were provided to the Defendants and reflected assets of $342,802,679,

liabilities of $368,237,411, and members' equity of negative $25,434,732).)

### b.  *The September 2022 Initial Forbearance Agreement*

On the same day as the parties' entry into the 2022 Note Purchase Agreement, the parties

also entered into the September 2022 Initial Forbearance Agreement.  (*See* FAC ¶ 48 (noting that

"on the same date, JSI purchased the $3 million note from GWA").)  While the terms of JSI's

agreement to forbear were substantially similar to those in the January 2022 Initial Forbearance,

such terms now applied to the 2022 Note Purchase Agreement and addressed all three Notes.

Specifically, the September 2022 Initial Forbearance Agreement provided, in relevant part, that:

13

> Notwithstanding (a) anything to the contrary in Section 7.3(b) of the [2022]
> Note Purchase Agreement and (b) the occurrence and continuation of a
> Members Equity Event, ***JSI hereby agrees that it will not exercise its rights
> to affect a Trigger Redemption prior to July 1, 2023 Forbearance*** . . .
> <u>provided</u> that [GWA] shall repay at least $20,000,000 of the aggregate
> outstanding principal amount of the [December 2019 and January 2020
> Notes] on or prior to July 1, 2023. At [GWA's] sole option, it can accelerate
> or make additional payments of principal of the [Notes] at any time. For
> the avoidance of doubt, if [GWA] shall fail to make any payment pursuant
> to this Section 1, the Forbearance shall cease and JSI shall thereafter have
> the right to redeem the [September 2022 Note] pursuant to Section 7.3(b)
> of the [2022] Note Purchase Agreement.

(September 2022 Initial Forbearance Agreement ¶ 1 (emphasis added).)

As reflected above, GWA was still required to make an aggregate payment in the amount of $20,000,000 to JSI on or prior to July 1, 2023. Moreover, like the January 2022 Initial Forbearance Agreement, this agreement also contained a similar reservation of rights with respect to the September 2022 Note and the 2022 Note Purchase Agreement and an acknowledgment that the parties received "adequate and sufficient consideration" for their entry into the same. (*See id.* ¶¶ 3–4.)

The Debtors argue that GWA and WMSA entered into the September 2022 Initial Forbearance Letter only because they had "no other options." (FAC ¶ 47.) The Debtors rearticulate a number of arguments they asserted with respect to the January 2022 Initial Forbearance Agreement, contending that (i) GWA and WMSA did not receive "reasonably equivalent value for the modification of the Maturity Dates under the Notes and the accelerated payment thereunder" as "no extension of the existing forbearance was offered and no new default was identified"; (ii) the Debtors did not "execute any acknowledgment of the occurrence of a default"; and (iii) the "modification under the Notes" was made when GWA and WMSA were insolvent or made insolvent or were otherwise caused to incur a debt "beyond their ability to pay as such debts matured." (*Id.*)

14

24-01350-mg    Doc 24    Filed 09/24/24    Entered 09/24/24 15:57:38    Main Document
Pg 15 of 76

> c. *The July 2023 Initial Forbearance Agreement and the $2 Million Payment*

GWA and WMSA were unable to make the $20 million payment by the July 1, 2023

deadline, which the Debtors suggest should not have come as a surprise to the Jefferies Entities

given their receipt of "detailed monthly financial statements from the Debtors at this time and . . .

constant communication with the Debtors about such situation." (*Id.* ¶ 49.)  The Jefferies

Entities, the Debtors argue, were "well aware of [their] precarious financial situation at all

relevant times."  (*Id.*)

Accordingly, GWA, WMSA, and JSI entered into the July 2023 Initial Forbearance

Agreement, the third in the series, which provided that:

> Notwithstanding (a) anything to the contrary in Section 7.3 of each of the
> [2019 and 2022] Note Purchase Agreements, (b) the occurrence and
> continuation of a Members Equity Event, and (iii) anything to the contrary
> in the [January 2022 Forbearance Agreement], ***JSI hereby agrees that it
> will not exercise its rights to affect a Trigger Redemption prior to
> September 1, 2024.***  At [GWA's] sole option, it can accelerate or make
> additional payments of principal at any time.

(July 2023 Initial Forbearance Agreement ¶ 1 (emphasis added); *see also* Supporting

Memorandum ¶ 21 (acknowledging JSI's commitment to forbear with respect to a trigger

redemption until September 1, 2024).)  Like the prior Initial Forbearance Agreements, this

agreement also included a similar reservation of rights as to all three Notes and the 2019 and

2022 Note Purchase Agreements as well as an acknowledgment and agreement that the parties

received "adequate and sufficient consideration" for their entry into the same.  (*Id.* ¶¶ 3–4.)

The Jefferies Entities maintain that notwithstanding the July 2023 Initial Forbearance

Agreement, pursuant to section 7.2 of the Note Purchase Agreements, JSI was "still free to

'redeem each Note, in whole but not in part, on each applicable Optional Redemption Date.'"

15

(Supporting Memorandum ¶ 21 (quoting 2019 Note Purchase Agreement § 7.2 and citing 2022 Note Purchase Agreement § 7.2).)

### C.  The Notice of Optional Redemption

On November 28, 2023, GWA made a $2 million payment to JSI.  (*See* FAC ¶ 52; *id.*, Schedule 1.)  On December 21, 2023, JSI delivered the *Notice of Optional Redemption* (the "Optional Redemption Notice," ECF Doc. # 21-9) to GWA pursuant to section 7.2 of the Note Purchase Agreements.  (Supporting Memorandum ¶ 22; FAC ¶ 53.)  As set forth in the Optional Redemption Notice, JSI elected to exercise its "right to redeem 100% of the outstanding aggregate principal amount" of the December 2019 Note, the January 2020 Note, and the September 2022 Note.  (Optional Redemption Notice at 1; *see also* Supporting Memorandum ¶ 22 ("GWA[] was required to pay all outstanding aggregate principal and interest on the Notes on December 31, 2023.").)  The Debtors indicate that these amounts totaled $54,223,110.00 and were due to JSI within 10 days or by December 31, 2023.  (FAC ¶ 53.)  Nonetheless, the Debtors failed to repay these amounts.  (Supporting Memorandum ¶ 22 ("December 31, 2023, came and passed, and the Debtors failed to repay the amounts then outstanding under the Notes."); *see also* FAC ¶ 54 (acknowledging that, "[a]t the time of the issuance of the [Optional Redemption Notice], Defendants were fully aware that GWA and WMSA were unable to make the required $54 million payment").)

The Jefferies Entities maintain that JSI's delivery of the Optional Redemption Notice granted JSI the "right to commence litigation against GWA to compel it to repay the amounts that were owed under the Notes" as of December 31, 2023.  (Supporting Memorandum ¶ 23 (suggesting that the Debtors were in default under the Note Purchase Agreements); 2019 Note Purchase Agreement § 10.2 (indicating that in the event of default, JSI was entitled to "protect

16

and enforce [its] rights . . . by an action at law, suit in equity or other appropriate proceeding”);

2022 Note Purchase Agreement § 10.2 (stating the same).)

The Debtors appear to suggest that the Jefferies Entities’ delivery of the Optional

Redemption Notice was covered under the July 2023 Initial Forbearance Agreement because the

effect was the same.  Specifically, they assert that, while the notice was styled as an Optional

Redemption, “by its terms the [Optional Redemption Notice] required the same immediate

payment of the Redemption Amount as would a notice of Trigger Redemption—the remedy

from which Defendants had agreed to forbear from exercising until September [1,] 2024.”  (FAC

¶ 53.)  Moreover, they indicate that at the time of issuance, the Jefferies Entities were “fully

aware that GWA and WMSA were unable to make the required $54 million payment” and had

been working on a “potential third-party transaction involving the Debtors, which, among other

things, would have paid or substantially paid amounts due under the Notes.”  (*Id.* ¶ 54.)

### D.  Debtors’ Payment of Bonuses and Signing of the 2024 Forbearance Agreement

Concerned that the Debtors would “prioritize the payment of other creditors above the

Jefferies Entities,” including making approximately $30 million in bonus payments to

employees, the Jefferies Entities delivered a draft forbearance agreement to the Debtors on

February 1, 2024.  (Supporting Memorandum ¶ 24.)  As set forth in that draft agreement, the

Jefferies Entities “offered to forbear from commencing any litigation against the Debtors, as long

as the Debtors agreed to not make the $30 million in bonus payments.”  (*Id.*)  The Debtors

“initially refused” to enter into the agreement as it would have “restricted payments to their

employees, violated their ongoing fiduciary obligations to their clients and their regulatory

obligations and undermine the potential third party transaction.”  (FAC ¶ 56.)  One week later,

the Debtors disclosed that they had paid employees more than $30 million in bonuses, which the

Jefferies Entities allege breached the Strategic Relationship Agreement and rendered all amounts

owed thereunder due and payable within five business days of February 8, 2024.  (Supporting Memorandum ¶ 25; *see also* FAC ¶ 51 ("GWA and WMSA continued to operate in the ordinary course of business, including, among other things, payment of . . . bi-monthly salary and year-end bonus/compensation.").)

In light of this, the Jefferies Entities informed the Debtors that, barring an agreement otherwise, they intended to "initiate litigation" to recover damages for Debtors' failure to repay debts owed and to avoid certain of the bonus payments made as fraudulent or preferential transfers.[7]  (Supporting Memorandum ¶ 26.)  The Debtors add more color to the passage of events.  They indicate that the Jefferies Entities "threatened" to commence such litigation on the morning of February 12, 2024 at 2:10 a.m. against the Debtors and their founder, George Weiss, if the Debtors failed to sign the draft forbearance agreement by 7:00 a.m. that same day.  (FAC ¶ 58.)  Aside from litigation, the Jefferies Entities also "threatened to unlawfully freeze the Debtors' bank accounts" and "ruin Mr. Weiss's reputation in the industry" while stating that things would get "extremely ugly."  (*Id.* (quotation marks omitted).)

The Debtors believed at the time that if the Jefferies Entities were to carry out on these "threats," it would collectively mean the "certainty of loss of key personnel, the collapse of . . . [a potential] third-party transaction, and the demise of the companies."  (*Id.* ¶ 60.)  The Debtors argue that, in actuality, the Jefferies Entities possessed "no legal right to take threatened enforcement actions" as to GWA and WMSA since GWA and WMSA were under a "preexisting obligation to forbear from taking [action] through September 1, 2024" or the remaining Debtors or George Weiss since they were not parties to the Notes or the Initial Forbearance Agreements.

---

[7]    Copies of the draft state court complaints that the Debtors believed were "in furtherance of [these] threat[s]" were delivered to the Debtors on February 17, 2024 and March 26, 2024.  (FAC ¶¶ 68–69.)  A copy of the first draft complaint delivered on February 17, 2024 is included as Exhibit F to the Balber Declaration (the "First Draft State Complaint," ECF Doc. # 7-8).

(*Id.* ¶ 59.)  Additionally, they assert that the Jefferies Entities had neither the legal right to claw back compensation (as payment of such was not otherwise prohibited under any agreement) nor the right to freeze bank accounts.  (*Id.*)

Ultimately, however, the Debtors and their founder and CEO, George Weiss, signed the draft forbearance agreement (the "2024 Forbearance Agreement," ECF Doc. # 21-10) on February 12, 2024.[8]  (Supporting Memorandum ¶ 27.)  The Debtors allege that their signature, which took place at approximately 4:00 a.m. that day, was compelled and a product of duress. (FAC ¶¶ 61, 66.)

### E.  The 2024 Forbearance Agreement

In exchange for the Jefferies Entities' agreement to forbear from exercising their rights in connection with the Notes and the Strategic Relationship Agreement for a period of up to two business days,[9] the Debtors and George Weiss "agreed to take four categories of action" that the Jefferies Entities believe are "relevant here."  (Supporting Memorandum ¶ 28; *see* 2024 Forbearance Agreement § 6 (indicating that JSI agreed to forbear from seeking relief or exercising any remedies under the Bankruptcy Code or filing an enforcement action from the "earlier of (x) two Business Days after [February 12, 2024] or (y) the occurrence of any Forbearance Default").)

*First*, each of the Debtors (other than GWA) agreed to guarantee GWA's obligations under the Notes and the Strategic Relationship Agreement, among other things.  (*See* 2024 Forbearance Agreement § 3(a); FAC ¶ 63.)  Section 3 of the 2024 Forbearance Agreement

---

[8]    George Weiss is party to the 2024 Forbearance Agreement only with respect to sections 5(a), 9, and 10(c).

[9]    While JSI and LAM Holdings were both parties to the 2024 Forbearance Agreement, section 6 of the 2024 Forbearance Agreement, which sets forth the terms of the forbearance, states only that JSI agreed to forbear and does not include LAM Holdings.  (*See* 2024 Forbearance Agreement § 6.)

provides that WMSA, WSO, OGI, and WMSF would "guarantee[] to each of JSI and LAM

Holdings . . . and their successors, transferees and assigns as a primarily obligor the prompt and

complete payment and performance by GWA and each other [Debtor] when due . . . of the

Guaranteed Obligations . . . ." (2024 Forbearance Agreement § 3(a).)  "Guaranteed Obligations"

is defined to comprise:

> [A]ll the obligations of GWA and each other [Debtor] arising under any
> Note Purchase Agreement, the Notes, the [Strategic Relationship]
> Agreement and this Agreement, any loss, damage, penalty, action,
> judgment, suit, cost, expense, disbursement, liability, claim or other
> obligation, incurred by or behalf of any Beneficiary (including but not
> limited to reasonable out-of-pocket attorneys' fees and costs) arising out or,
> relating to or in connection with any Note Purchase Agreement, any Note,
> the [Strategic Relationship] Agreement, this Agreement or the transaction
> contemplated thereby.

(*Id.*)  Such guaranty remains in "full force and effect until the Guaranteed Obligations are paid in

full."  (*Id.*)

*Second*, the Debtors' founder and CEO, George Weiss, "unconditionally and irrevocably"

personally guaranteed to "[LAM Holdings, JSI, and their affiliates] the accuracy of the

representations made by, and the performance of the agreements of, the [Debtors] hereunder."

(*Id.* § 9.)  Weiss also agreed that he would "take all actions within his control . . . with respect to

each of the other [Debtors], any of their subsidiaries and any of his personal or his family's trusts

to cause such persons to comply with the terms of [the 2024 Forbearance] Agreement."  (*Id.*)

*Third*, the Debtors granted the Jefferies Entities a security interest in substantially all of

their assets.  (Supporting Memorandum ¶ 30; FAC ¶ 63.)  The Debtors represented and

warranted that the Jefferies Entities would be entitled to a "first priority perfected security

interest in the Collateral" to secure the "full and punctual payment of the Guaranteed

20

Obligations."[10]  (*Id.* §§ 4(a) and (b).)  Such security interest would "continually exist until all

Guaranteed Obligations have been paid in full."  (*Id.* § 4(a).)

    *Fourth*, WMSA agreed to offset any amounts owed by JSI to WMSA under the IMA by

amounts owed to JSI under the Notes:

> WMSA hereby agrees as of the date hereto to treat any amounts JSI owes
> WMSA pursuant to the IMA (including but not limited to any amounts for
> the period of January 1, 2023 through December 31, 2023, including but not
> limited to the Investment Teams Bonus Fees) as offsetting GWA's payment
> obligations to JSI under the Notes, and as a result (I) JSI shall have been
> deemed to have paid such amounts to WMSA and (ii) such deemed paid
> amounts shall be deemed to be a receipt by JSI of a payment by GWA on
> the Notes of such amounts.

(*Id.* § 8; *see also* FAC ¶ 63.)

    In addition to the foregoing, the Debtors note that the 2024 Forbearance Agreement also

required the Debtors to provide the Jefferies Entities with updated financial reports, which they

had already been doing "for at least two years."  (*Id.* ¶ 64.)  The Debtors indicate that the

Jefferies Entities' agreement to forbear is the only "purported consideration under the 2024

Forbearance Agreement" that they have provided.  (*Id.* ¶ 65.)

---

[10]     "Collateral" is defined to include:

> [A]ll goods, accounts, equipment, inventory, contract rights or rights to payment of money,
> leases, license agreements, franchise agreements, general intangibles, commercial tort
> claims, documents, instruments (including any promissory notes), chattel paper (whether
> tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit,
> fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing),
> securities, and all other investment property, supporting obligations, and financial assets,
> whether now owned or hereafter acquired, wherever located; and all of each [Debtor's]
> books and records relating to the foregoing, and any and all claims, rights and interests in
> any of the above and all substitutions for, additions, attachments, accessories, accessions
> and improvements to and replacements, products, proceeds and insurance proceeds or any
> or all of the foregoing. Terms used in this definition shall have the meanings given to such
> terms in Article 9 of the Code (as defined below), as applicable.

(2024 Forbearance Agreement § 4(a).)

As of the date of the FAC, the Debtors have not received a countersigned copy of the 2024 Forbearance Agreement.[11]  (*Id.* ¶ 66.)  Nonetheless, the Jefferies Entities filed UCC-1 financing statements on February 12, 2024 and February 13, 2024, seeking to perfect the security interests "purportedly granted under the 2024 Forbearance Agreement" (the "Security Interests").  (*Id.*; *see also* 2024 Forbearance Agreement § 4(c) (authorizing JSI, as the "Secured Party" under the agreement to "file financing statements . . . to perfect or protect the Secured Party's interest or rights [t]hereunder").)  The Debtors do not believe that the Jefferies Entities have sought to perfect "any purported security interest" against WMSF.  (FAC ¶ 66.)

The Debtors contend that the 2024 Forbearance Agreement lacks consideration as the Jefferies Entities were already under a preexisting obligation to not call the Notes through September 1, 2024 as to GWA and WMSA, and none of the other Debtors were subject to the Note Purchase Agreements, Notes, or the Initial Forbearance Agreements.  (*Id.* ¶ 62.)  Like the Initial Forbearance Agreements, the 2024 Forbearance Agreement is also governed by New York law.  (2024 Forbearance Agreement § 10(h).)

### F.  OGI's $3 Million Payment to JSI

On February 15, 2024, OGI paid $3,000,000 to JSI on account of the outstanding Notes on behalf of GWA.  (Supporting Memorandum ¶ 32; FAC ¶ 71, Schedule 1.)  After accounting for this payment, the Jefferies Entities maintain that approximately $50 million remains due and payable under the Notes.  (*Id.*; *see also id.* ¶ 33 (noting that GWA's own court filings disclose that it owes $43,190,924 to JSI on account of the Notes).)

---

[11]     The signature page to the 2024 Forbearance Agreement reflects only George Weiss's signature on behalf of the Debtors and himself.  (*See* 2024 Forbearance Agreement at 11.)

### G. Commencement of the Chapter 11 Cases

On April 29, 2024 (the "Initial Debtors Petition Date"), WMSA, GWA, OGI, and WSO (collectively, the "Initial Debtors") each filed voluntary petitions for chapter 11 relief. (*See, e.g.*, Case No. 24-10743, ECF Doc. # 1.) On June 19, 2024 (the "New Debtor Petition Date"), WMSF filed a voluntary petition for chapter 11 relief. (*See* Case No. 24-11075, ECF Doc. # 1.)

The Debtors' cases are being jointly administered. (*See Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of Chapter 11 Cases*, Case No. 24-10743, ECF Doc. # 51; *Order Directing Certain Orders in Chapter 11 Cases of Weiss Multi-Strategy Advisers LLC, et al. be Made Applicable to Weiss Multi- Strategy Funds LLC*, Case No. 24-10743, ECF Doc. # 120.)

The Jefferies Entities highlight that the Debtors' court filings disclose the following:

- GWA owes $43,190,924.00 to JSI under the Notes, and $52,473,259.00 to LAM Holdings pursuant to the Strategic Relationship Agreement;

- the Jefferies Entities are the only creditors of OGI and WSO; and

- WMSA owes $95,664,183.00 to the Jefferies Entities while the remainder of its liabilities have nearly all been categorized as "contingent."

(Supporting Memorandum ¶ 33.)

### H. The Adversary Proceeding

In conjunction with the chapter 11 filing, the Debtors commenced the Adversary Proceeding against the Jefferies Entities. Pursuant to the FAC, the Debtors seek, at the outset, entry of a judgment against the Defendants for the avoidance of the 2024 Forbearance Agreement, including any security interests and guarantees arising thereunder as preferential and/or fraudulent transfers, and the recovery of any property of the Debtors' estates. (FAC ¶¶ 80–108.) Alternatively, they argue that, because the Debtors entered into the 2024 Forbearance Agreement under duress, rescission of the 2024 Forbearance Agreement is

23

appropriate. (*Id.* ¶¶ 109–17.) Lastly, the Debtors believe that the Defendants' failure to execute the 2024 Forbearance Agreement and the overall lack of consideration thereunder and intent to comply warrant a judgment deeming the 2024 Forbearance Agreement null and void and otherwise unenforceable. (*Id.* ¶¶ 118–23.)

The Debtors also seek money judgments relating to (i) $3 million as an avoidable preferential transfer made within 90-day period prior to the Initial Debtors Petition Date from January 31, 2024 through April 29, 2024 (the "Preference Period") and (ii) $20 million in the aggregate in connection with certain alleged avoidable fraudulent transfers (each, an "Alleged Avoidable Transfer" and collectively, the "Alleged Avoidable Transfers") made during the two years prior to the Initial Debtors Petition Date from April 29, 2022 through April 29, 2024 (the "Fraudulent Conveyance Period").[12] (*Id.* ¶¶ 124–39.) The Alleged Avoidable Transfers are as follows:

| Transferor | Transferee | Date | Amount |
|---|---|---|---|
| GWA, LLC | JSI | 4/29/2022 | $5,000,000 |
| GWA, LLC | JSI | 7/29/2022 | $10,000,000 |
| GWA, LLC | JSI | 11/28/2023 | $2,000,000 |
| OGI Associates, LLC | JSI | 2/15/2024 | $3,000,000 |
| | | | $20,000,000 |

(*Id.*, Schedule 1.)

The following sets forth an overview of the 12 causes of action asserted in the FAC:

- Counts I and II respectively seek avoidance of the 2024 Forbearance Agreement as (i) a preferential transfer pursuant to section 547(b) of the Bankruptcy Code and (ii) a fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code. (*Id.* ¶¶ 80–97.)

- Count III seeks avoidance of the Security Interests, including any related UCC-1 filing, and the guarantees arising under the 2024 Forbearance Agreement as (i) a preferential

---

[12]    As discussed later in this memorandum, it is unclear how much the Debtors are actually seeking to avoid as constructive fraudulent transfers as the FAC and the Debtors' Opposition Brief refer to different amounts (*i.e.*, $20 million versus $17 million).

transfer pursuant to section 547(b) of the Bankruptcy Code and/or (ii) a fraudulent transfer pursuant to sections 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶¶ 98–101.)

- Counts IV and X respectively seek, for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code, preservation of the interests and obligations incurred and/or transferred under (i) the 2024 Forbearance Agreement (or value thereof) and (ii) the Avoidable Transfers.  (*Id.* ¶¶ 102–04, 140–42.)

- Counts V and XI respectively seek, pursuant to section 550(a) of the Bankruptcy Code, to (i) avoid the 2024 Forbearance Agreement, including the Security Interests arising thereunder, and (ii) recover from Defendants, in an amount to be determined at trial, at least the amount of the Avoidable Transfers set forth on Schedule 1 to the FAC plus interest and costs.  (*Id.* ¶¶ 105–08, 143–46.)

- Count VI seeks the rescission of the 2024 Forbearance Agreement has having been the product of duress.  (*Id.* ¶¶ 109–17.)

- Count VII seeks judgment holding that the 2024 Forbearance Agreement is null and void, and unenforceable for the Jefferies Entities' failure to countersign and the general lack of consideration thereunder and intent to comply.  (*Id.* ¶¶ 118–23.)

- Count VIII seeks avoidance of the $3,000,000.00 as a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.  (*Id.* ¶¶ 124–34.)

- Count IX seeks avoidance of the Alleged Avoidable Transfers as fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶¶ 135–39.)

- Count XII seeks disallowance, pursuant to section 502(d) of the Bankruptcy Code, of any and all claims of Defendants and their assignees against the Debtors' estates or the Debtors until the 2024 Forbearance Agreement is deemed null and void and/or the Defendants pay Debtors all amounts sought for the Alleged Avoidable Transfers.  (*Id.* ¶¶ 147–51.)

### I.  The Motion

The Jefferies Entities seek, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to the Adversary Proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, partial dismissal of the causes of action asserted in the FAC.  (*See* Supporting Memorandum ¶ 73.)  As set forth in the Motion, they seek the dismissal of (i) "Counts I, II, and IV through XII of the Complaint in their entirety," and (ii) "Count III to the extent it asserts a constructive fraudulent conveyance claim."  (*Id.*)  At the hearing held on

September 11, 2024, counsel to the Jefferies Entities clarified that Count I, consistent with Count III, would also survive dismissal "to the extent that it asserts a preference claim seeking to avoid the granting of security interests." (Sept. 11, 2024 Hr'g Tr. at 18:2–9.)

As a gating matter, the Jefferies Entities contend that the 2024 Forbearance Agreement, as a whole, is neither a transfer of an interest in the Debtors' property nor an obligation that is voidable under the Bankruptcy Code. (Supporting Memorandum ¶ 34.) In light of such, Counts I and II, the Jefferies Entities argue, should be dismissed as there is no legal basis to support the Debtors' conclusion that the entire 2024 Forbearance Agreement can be avoided as opposed to specific transfers and obligations. (*Id.* ¶¶ 4, 34–39.)

Additionally, the Jefferies Entities believe that dismissal of Counts II and III of the FAC is also appropriate given the Debtors' acknowledgment that the 2024 Forbearance Agreement was entered into on account of antecedent debts. (*Id.* ¶¶ 4, 43–44; *see* FAC ¶ 85 ("The 2024 Forbearance Agreement was for or on account of antecedent debts owed by certain of the Plaintiffs to Defendants.").) The Court should therefore, the Jefferies Entities contend, construe any transfers or obligations incurred under the 2024 Forbearance Agreement as having been made for reasonably equivalent value. (Supporting Memorandum ¶ 44.)

As for the remainder of the causes of action, the Jefferies Entities argue that dismissal of (i) Counts VI, VIII, and IX is appropriate because the Debtors have failed to plead facts that support or establish elements of these claims (*id.* ¶¶ 47–48, 57–59, 60–65); (ii) Count VII because the 2024 Forbearance Agreement was supported by consideration, and the Debtors have pled facts that establish that the Jefferies Entities accepted the 2024 Forbearance Agreement notwithstanding their failure to countersign the agreement (*id.* ¶¶ 50–56); (iii) Counts IV, V, X,

and XI as they cannot stand as independent causes of action (*id.* ¶¶ 66–68); and (iv) Count XII as it is premature and procedurally improper (*id.* ¶ 70).

### J.  The Debtors' Opposition

The Debtors oppose the Motion and argue, instead, that each claim in the FAC is "adequately pled" such that dismissal would be inappropriate at this juncture.  (Opposition Brief at 3.)  With respect to Counts I and III, the Debtors assert that the FAC has sufficiently pled claims that the 2024 Forbearance Agreement, including the Security Interests, should be avoided as preferential transfers.  (*Id.* at 14.)  They detail that the FAC properly alleges that (i) the Jefferies Entities were creditors; (ii) the 2024 Forbearance Agreement was a transfer of an "interest of the Debtors in property"; (iii) the Debtors were insolvent at the time of the alleged transfer (*i.e.*, the Debtors' entry into the 2024 Forbearance Agreement); and (iv) the agreement enabled the Defendants to receive more than they would have if the Debtors were in chapter 7, such agreement had not been made, and the Defendants otherwise received payment of such debt as permitted under the Bankruptcy Code.  (*Id.* at 10–14.)  The Debtors reject the Jefferies Entities' argument that the 2024 Forbearance Agreement cannot be avoided in its entirety since the obligations and transfers the Debtors seek to avoid constitute the "substance of the 2024 Forbearance Agreement, such that their avoidance will have the practical effect of invalidating the eve-of-bankruptcy transaction as a whole." (*Id.* at 12.)

For similar reasons, the Debtors also maintain that dismissal of Counts II and III, the latter of which also alleges that the Security Interests should be avoided as a fraudulent transfer, is inappropriate since the FAC alleges that (i) the 2024 Forbearance Agreement was a transfer of an interest of the Debtors in property or incurrence of an obligation, and (ii) consideration given was for less than reasonably equivalent value.  (*Id.* at 14–18.)  Moreover, in any event, whether reasonably equivalent value was given, the Debtors note, is a question of fact.  (*Id.* at 16.)

With respect to Count VI, the FAC, the Debtors argue, alleges that the Jefferies Entities' actions, which they had no right to take, constituted wrongful threats and prevented the Debtors "free will . . . by giving them no alternative to signing" and resulted in nothing more than irreparable harm.  (*Id.* at 19.)  The FAC, the Debtors maintain, also makes clear that they possess no adequate remedy at law such that rescission to restore the status quo is appropriate.  (*Id.*)  With respect to Count VII, the Debtors maintain that the FAC sufficiently pleads lack of consideration and, regardless, there is a question of fact whether there was a "meeting of the minds" that would need to exist for a valid agreement.  (*Id.* at 20.)

As for avoidance of the $3 million payment as a preferential transfer and the $17 million payments as fraudulent transfers under Counts VIII and IX, respectively, the Debtors argue that the FAC properly alleges each element of the respective claim.  (*Id.* at 20–22.)  Additionally, with respect to the latter, the Debtors suggest that the FAC, at a minimum, has established that a question of fact exists whether the Debtors were or were rendered insolvent or left with unreasonably small capital at the time of the Alleged Avoidable Transfers.  (*Id.* at 23.)

With respect to the remaining claims, the Debtors acknowledge the conditionality of relief sought in Counts IV, V, X, and XI but note, however, that the FAC has properly alleged each of these claims is adequately pled.  (*Id.* at 24.)  Indeed, the Debtors argue that it is undisputed that the Jefferies Entities were "initial transferees" under any of the alleged avoidable transfers pled in the FAC.  (*Id.*)  As for Count XII, the Debtors maintain that because they have asserted claims under sections 547 and 548 of the Bankruptcy Code, this claim is sufficiently pled as well.  (*Id.* at 24–25.)

Finally, the Debtors seek leave to file a further amended adversary complaint in the event the Court grants dismissal of any counts asserted in the FAC.  (*Id.* at 25.)

28

### K.  The Jefferies Entities' Reply

The Jefferies Entities characterize the FAC as nothing more than a "desperate effort to

protect non-debtor George Weiss . . . from paying the Jefferies Entities the more than $100

million that his companies owe, and which he contractually guaranteed."  (Reply Brief ¶ 3; *see

id.* ¶ 4 ("[I]t is undisputed that at least $95 million is owed now and was owed at the time the

[Amended] Forbearance Agreement was signed.").)  They maintain that they have demonstrated

that (i) George Weiss's personal guarantee cannot be avoided as it neither constitutes a "transfer

of an interest in the property of any debtor" or an "obligation" of a debtor, and (ii) the Debtors

have failed to plead any basis to avoid more than $17 million in payments that the Debtors

conceded were on account of antecedent debts.  (*Id.* ¶ 1.)

Accordingly, the Jefferies Entities argue that avoidance of the 2024 Forbearance

Agreement in its entirety—including George Weiss's personal guarantee—is without support

and should be dismissed.  (*Id.* ¶¶ 7–10.)  Moreover, dismissal of the claim for the avoidance of

the 2024 Forbearance Agreement as a constructive fraudulent transfer is also appropriate given

the Debtors' failure to affirmatively plead that the alleged fraudulent transfers were made on

account of antecedent debts.  (*Id.* ¶¶ 11–13.)

As for the Debtors' claim for rescission of the 2024 Forbearance Agreement, the Jefferies

Entities argue that such claim is without merit as (i) the FAC fails to plead any wrongful threat

that would support a claim for duress (*id.* ¶¶ 15–17); (ii) the Debtors' allegations of lack of

consideration are without merit (*id.* ¶¶ 18–20); and (iii) the Debtors have otherwise admitted to

facts that demonstrate the Jefferies Entities' acceptance of the 2024 Forbearance Agreement (*id.*

¶¶ 21–23).

The Jefferies Entities further contend that Debtors' $3 million preference claim should

also be dismissed since the Debtors cannot establish that JSI received more than it would have in

a hypothetical chapter 7 case and, in any event, OGI's guarantee is not avoidable as a fraudulent transfer. (*Id.* ¶¶ 24–27.) Likewise, the Jefferies Entities assert that the Debtors have failed to plead facts that the $17 million payments were for "reasonably equivalent value," admitting instead that they received "$17 million in credits for $17 million in payments." (*Id.* ¶¶ 28–30.) This, the Jeffries Entities argue, warrants a dismissal of the Debtors' constructive fraudulent transfer claims as well. (*Id.* ¶ 30.)

As for the remaining claims, the Jefferies Entities reiterate their prior arguments. With respect to Counts IV, V, X, and XI, the Jefferies Entities assert that dismissal is appropriate since such claims cannot stand as independent causes of action. (*Id.* ¶ 31.) With respect to Count XII, the Jefferies Entities state again that this claim is "not ripe." (*Id.* ¶ 32.)

Finally, the Jefferies Entities argue that the Court should deny the Debtors' request for further opportunity to amend the adversary complaint. (*Id.* ¶ 33.) They argue that the Debtors already had a "bite at the apple," having amended the complaint once already and have "provided no additional facts that they would seek to include" if so permitted. (*Id.*)

## II.    <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted). Under this standard, the pleading's "[f]actual allegations

30

must be enough to raise a right to relief above the speculative level," *id*. at 555, and present

claims that are "plausible on [their] face," *id*. at 570.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it

stops short of the line between possibility and plausibility of entitlement to relief." *In re Vivaro*

*Corp.*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plausibility

"is not akin to a probability requirement," but rather requires "more than a sheer possibility that a

defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks

omitted). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at

555 (stating that a pleading that offers "labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do"). Rather, pleadings "must create the possibility of a

right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520

F.3d 178, 183 (2d Cir. 2008) (citation omitted). "A claim has facial plausibility when the

pleaded factual content allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss.

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013)

(stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo

working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v.*

*Citibank, N.A.* (*In re the 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90) (Bankr. S.D.N.Y. 2009)

(stating that courts use a two-prong approach when considering a motion to dismiss). First, a

court must accept all factual allegations in the complaint as true, discounting legal conclusions

clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum*

31

*Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). Second, a court must determine if these well-pleaded factual allegations state a plausible claim for relief—"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). "Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice – such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

### III.   DISCUSSION

#### A.  Validity and Binding Nature of the 2024 Forbearance Agreement

As an initial matter, the Debtors have asserted claims centered on the validity and binding nature of the 2024 Forbearance Agreement generally, including claims for rescission and a judgment that the agreement is otherwise null and void. Each is addressed in turn.

##### 1.  Rescission of the 2024 Forbearance Agreement as a Product of Duress

Under New York law, which governs the 2024 Forbearance Agreement, rescission is an equitable and "extraordinary" remedy that is unavailable "when there is an adequate remedy at law." *Ward v. TheLadders.com*, 3 F. Supp. 3d 151, 164–65 (S.D.N.Y. 2014) (citing *Ellington v. Sony/ATV Music Publ'g LLC*, 925 N.Y.S.2d 20, 22 (App. Div. 2011)); *see also Bangkok Crafts*

*Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03 Civ. 0015 (RWS), 2006 WL 1997628, at

*12 (S.D.N.Y. July 18, 2006) ("Re[s]cission is an equitable remedy posed in the interest of

justice where there is no action at law."); *Robinson v. Sanctuary Record Grps., Ltd.*, 826 F. Supp.

2d 570, 575 (S.D.N.Y. 2011) ("Under New York law, [r]ecession is an extraordinary remedy . . .

.") (alterations in original) (quoting *Krumme v. WestPoint Stevens, Inc.*, 239 F.3d 133, 143 (2d

Cir. 2000)).  "The effect of rescission is to declare the contract void from its inception and to put

or restore the parties to ***status quo***."  *County of Orange v. Grier*, 817 N.Y.S.2d 146, 148 (App.

Div. 2006) (emphasis in original) (internal quotation marks omitted) (quoting *Schwartz v. Nat'l

Comput. Corp.*, 345 N.Y.S.2d 579, 582 (App. Div. 1973)).

Generally, "[t]here is no hard and fast rule on the subject of rescission, for the right

usually depends on the circumstances of the particular case."  *Creative Waste Mgmt., Inc. v.

Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 606 (S.D.N.Y. 2006) (alterations in original)

(quoting *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910)).  Recission may be permitted in

instances of "fraud or ***duress in the inducement of the contract***, failure of consideration,

inability to perform, or a breach of the contract so substantial that it defeats the object of the

parties in making the contract."  *Id.* (emphasis added) (citations omitted); *see also Highland

CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827 (NRB), 2013 WL

1191895, at *9 (S.D.N.Y. Mar. 22, 2013) ("Economic duress is a theory of recovery for

rescission . . . ."); *Bangkok*, 2006 WL 1997628, at *12 ("The grounds for rescission of a contract

include duress . . . in situations where the complaining party is compelled to agree to the contract

by means of a wrongful threat which precludes the exercise of free will.").

To establish a claim for economic duress under New York law, a party must show that

the agreement in question was "procured by means of (1) a wrongful threat that (2) precluded the

exercise of its free will."[13]  *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142

(2d Cir. 2011) (collecting cases).  Put another way, the party asserting economic duress must

show "(1) threats of an unlawful act by one party [that] (2) compel[] performance by the other

party of an act [that] it had a legal right to abstain from performing."  *In re Lehman Bros.*

*Holdings Inc.*, 855 F.3d 459, 477 (2d Cir. 2017) (alterations in original) (quoting *Chase*

*Manhattan Bank v. New York,* 787 N.Y.S.2d 155, 157 (App. Div. 2004)).  A contract entered into

under duress, under New York law, is "generally considered not void, but merely voidable . . .

and one who would repudiate a contract procured by duress must act promptly or will be deemed

to have elected to affirm it."  *U.S. v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir.

2011) (quoting *Sci. Holding Co. v. Plessey Inc.*, 510 F.2d 15, 23 (2d Cir. 1974)).

Like rescission, economic duress under New York law is "reserved for extreme and

extraordinary cases."  *Lehman*, 855 F.3d at 477 (quoting *VKK Corp. v.* NFL, 244 F.3d 114, 123

(2d Cir. 2001)); *see also Citibank, N.A. v. Tormar Assocs. LLC*, No. 15-CV-1932 (JPO), 2015

WL 7288652, at *4 (S.D.N.Y. Nov. 17, 2015) ("In general, agreements governed by New York

law may be voided on grounds of economic duress only in extreme and extraordinary cases.")

(internal quotation marks and citations omitted)).  And, in cases involving sophisticated parties,

duress is "particularly difficult to meet."  *Tormar*, 2015 WL 7288652, at *4.  To demonstrate

duress, a sophisticated party must "do more than allege 'financial or business pressure' or

unequal bargaining power," *id.*, including "merely claim[ing] that the other party knew about and

used his or her poor financial condition to obtain an advantage in contract negotiations," *Davis &*

*Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) (quoting

---

[13]   While the Debtors do not make explicit whether they are alleging economic duress, the Opposition Brief
suggests that this is the case as the Debtors argue that the FAC has sufficiently alleged "wrongful threats" on the
part of the Defendants whose actions "prevented the free will of Plaintiffs by giving them no alternative to signing
the [2024] Forbearance Agreement but irreparable harm."  (Opposition Brief at 19.)

*DuFord v. Aetna Life Ins.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993)). *See also Interpharm*, 655

F.3d at 142 (stating the same). Rather, a plaintiff would need to demonstrate that the other

party's actions "deprived him of his free will, and that the ordinary remedy of an action for

breach of contract would not be adequate." *Davis*, 168 F. Supp. 2d at 114 (quoting *Berman v.

Parco*, No. 96 Civ. 0375 (KMW), 1996 WL 465749, at *7 (S.D.N.Y. Aug. 15, 1996)).

### a.  Wrongful Threats

To demonstrate duress, "[t]he law demands threatening conduct that is wrongful, *i.e.*,

outside a party's legal rights." *Interpharm*, 655 F.3d at 142 (internal quotations marks and

citations omitted). Accordingly, while a threat to withhold performance one was contractually

obligated to provide in order to compel the other party to submit to demands may constitute a

wrongful threat, a threat to exercise a legal right in pursuit of those same demands is not. *Id.* at

142–43 (collecting cases). In other words, "threats to enforce a party's legal rights under a

contract—or even that party's interpretation of its rights—cannot constitute a wrongful threat

sufficient to establish a claim of economic duress." *Davis*, 168 F. Supp. 2d at 115 (quoting

*DiRose v. PK Management Corp.*, 691 F.2d 628, 633 (2d Cir.1982)).

Here, the FAC alleges that the Jefferies Entities demanded that the Debtors sign the 2024

Forbearance Agreement or "unlawful" litigation would be commenced against "the Debtors and

George Weiss" to collect damages stemming from the "Debtors' purported breaches" of the Note

Purchase Agreements and Notes and to claw back compensation payments made to the Debtors'

employees as fraudulent transfers. (FAC ¶ 58.) The FAC further alleges that the Defendants

"threatened to unlawfully freeze the Debtors' bank accounts"[14] and "ruin George Weiss's

---

[14]    Paragraph 58 of the FAC states that these bank accounts were the Debtors' while paragraph 59 of the FAC
states that these were Defendants' bank accounts. It should make sense that they are Debtors' bank accounts as
opposed those of the Jefferies Entities.

reputation in the industry, including by filing fraud claims against him." (*Id.*)  Notably, in the

Debtors' mind, the Jefferies Entities' threatened actions were, collectively, a death sentence—the

"certainty of loss of key personnel," the "collapse" of a potential third-party financing

transaction, and the "demise of the companies" that would foreclose any opportunity for an

orderly winddown and for the Debtors to comply with their fiduciary duties and obligations to

regulatory agencies.  (*Id.* ¶ 60.)

Meanwhile, the Jefferies Entities contend that the Debtors have failed to plead any

wrongful threat in the FAC since the Jefferies Entities were merely enforcing legal rights they

possessed.  (Supporting Memorandum ¶ 48; Reply Brief ¶ 15.)  With respect to GWA and

WMSA and alleged breaches of the Note Purchase Agreements and Notes, this may be true.  The

FAC argues that the Defendants lacked any "legal right" to pursue enforcement actions against

GWA and WMSA as they were under a preexisting obligation to forbear through September 1,

2024.  (*See* FAC ¶ 111.)  However, that preexisting obligation to forbear was limited solely to

JSI exercising its right to affect a Trigger Redemption under the Note Purchase Agreements.

(*See* July 2023 Initial Forbearance Agreement ¶ 1.)  The Trigger Redemption provision provided

JSI with the right to redeem the Notes, in whole or in part, at any time after the occurrence of

certain events.  (*See, e.g.*, 2019 Note Purchase Agreement § 7.3.)  Meanwhile, the July 2023

Initial Forbearance Agreement included a reservation of rights that provides that the agreement

"shall not, by implication or otherwise, constitute a termination, waiver or amendment of, or

otherwise affect the rights and remedies of JSI as a holder of the Notes."  (July 2023 Initial

Forbearance Agreement ¶ 3.)  Additionally, JSI "reserve[d] all rights and remedies . . . that JSI is

entitled to exercise under the Notes, the Note Purchase Agreements, any related documents or

otherwise at law or in equity."  (*Id.*)

36

These remedies include a right for JSI to initiate legal action to enforce its rights.  Section 10.2 of the Note Purchase Agreements provides that, in the event of a default or an event of default, "the holders of the Notes at the time outstanding may proceed to protect and enforce the rights of such holders by an action at law, suit in equity, or other appropriate proceeding." (2019 Note Purchase Agreement § 10.2; *see* 2020 Note Purchase Agreement § 10.2 (stating the same as to the September 2022 Note).)  Such a proceeding may be for "specific performance of any agreement contained [t]herein or in the Notes, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise." (2019 Note Purchase Agreement § 10.2; *see* 2020 Note Purchase Agreement § 10.2 (stating the same to the September 2022 Note).)  An "event of default" is defined to encompass, among other things, GWA's default in the "payment of the Redemption Payment on the Note[s] . . . when those [N]otes become due and payable."  (*Id.* § 9(a); *see* 2019 Note Purchase Agreements § 9(a) (stating the same as to the December 2019 Note and the January 2020 Note).)

The Jefferies Entities issued the Optional Redemption Notice, requiring GWA to pay all outstanding amounts on the Notes on December 31, 2023, which the Debtors acknowledged they failed to pay.  (*See* FAC ¶¶ 53–54.)  As the Jefferies Entities' exercise of its rights for Optional Redemption was not subject to the July 2023 Initial Forbearance Agreement and is separate and apart from JSI's right to a Trigger Redemption, the Debtors' failure to timely pay the outstanding amounts by the December 31, 2023 constituted an event of default under the Note Purchase Agreements.  Therefore, the Jefferies Entities were well within their right to commence an enforcement action against GWA and WMSA pursuant to section 10.2 of the Note Purchase

Agreements and any threat to do so cannot constitute a wrongful threat.[15]  *See Davis*, 168 F.

Supp. 2d at 115 (providing that threats to enforce legal rights under a contract cannot constitute a

wrongful threat sufficient to establish a claim of economic duress).

Similarly, the Jefferies Entities' threats of clawback litigation and the possible freezing of

the Debtors' bank accounts were also an enforcement of the Jefferies Entities' legal rights under

the Strategic Relationship Agreement.  The FAC alleges that there was no legal basis for the

Jefferies Entities to threaten either.  (*See* FAC ¶ 59.)  However, section 2(a) of the Strategic

Relationship Agreement prohibits GWA, subject to certain exceptions, from entering into "any

agreements or other arrangements . . . to, take any action that could reasonably be expected to

***prevent, restrict or delay [GWA] from making any payment due under Section 1***."[16]  (Strategic

Relationship Agreement § 2(a) (emphasis added).)  This includes, "without limitation, any

agreement or other arrangement that ***could have the effect of diluting or subordinating*** [LAM

Holdings'] interest" in GWA's profits or revenue "in addition to ***all other remedies available to***

***such Party at law or in equity***, subject to the terms of [the Strategic Relationship Agreement]."

(*Id.* (emphasis added).)  In the event of a breach or even threatened breach of the Strategic

---

[15]     When questioned at the September 11, 2024 hearing whether the Debtors had any support for their
contention that the Jefferies Entities (or any party) were precluded from filing a lawsuit to recover money they were
contractually owed, the Debtors cited to *In re TMST Inc.*, 518 B.R. 329 (Bankr. D. Md. 2014), *vacated in part*, No.
09-17787-DK, 2014 WL 6390312 (Bankr. D. Md. Nov. 14, 2014).  (*See* Sept. 11, 2024 Hr'g Tr. at 38:11–14 ("I
believe . . . that the Court in *TMST* . . . addresses this").  Debtors' counsel stated that he read the case to "indicate
that if one party believed there would be irreparable harm as a result of the actions taken by another party and was
able to sufficiently plead that in the complaint, that that was . . . sufficient for the Court to find that at this stage of
litigation . . . that claim is viable or plausible." (Sept. 11, 2024 Hr'g Tr. at 39:15–23.)  However, the *TMST* court,
applying New York law, only reached this conclusion after determining that there was no lawful exercise of
contractual rights.  *See TMST*, 518 B.R. at 352 (rejecting the Defendants' characterization of the pleaded facts as
"reciting only lawful exercise of contractual rights" and finding the specific allegations of unlawful and inflated
margin calls sufficient to establish a wrongful threat).  Therefore, *TMST* is inapplicable to this point.  (*See also*
Opposition Brief at 19 (citing to *TMST* only for the principle that "*free will is precluded* if irreparable harm would
be suffered should the threat be carried out and circumstances permit no other alternative to the agreement"
(emphasis added)).)

[16]     Section 1 of the Strategic Relationship Agreement governs LAM Holdings' rights to share in GWA's
profits and revenue and sets forth, among other things, a payment schedule.  (*See* Strategic Relationship Agreement
§ 1.)

Relationship Agreement, LAM Holdings and GWA are each entitled to seek "equitable relief, including an injunction and specific performance" as "monetary damages may be an inadequate remedy . . . because of the difficulty of ascertaining the amount of damage that will be suffered." (Strategic Relationship Agreement § 5(a).)

The Debtors concede that amounts were owed to the Jefferies Entities under the Strategic Relationship Agreement.  In the Initial Debtors First Day Declaration, the Debtors disclose that, as of the Petition Date, the Jefferies Entities were owed approximately $43.2 million on account of the Notes and approximately $52.5 million on account of the Strategic Relationship Agreement.  (Initial Debtors First Day Declaration ¶ 46.)  Indeed, at the September 11 hearing, Debtors' counsel admitted that, ***prior to*** entering into the 2024 Forbearance Agreement, the Debtors collectively owed the Jefferies Entities over $100 million for amounts due under different agreements.  (*See* Sept. 11, 2024 Hr'g Tr. at 35:21–36:1 (disclosing that the Jefferies Entities were owed "in the neighborhood of 100 million . . . under various agreements" before the 2024 Forbearance Agreement was signed).)  The Jefferies Entities believed that the employee compensation payments constituted a breach of the Strategic Relationship Agreement, rendering all amounts arising thereunder due and payable.  (*See* Supporting Memorandum ¶ 25.)  Section 5(a) of the Strategic Relationship Agreement entitled LAM Holdings then to seek "equitable relief" as well as "all other remedies available . . . at law or in equity."  (Strategic Relationship Agreement § 5(a).)  Therefore, the Jefferies Entities' threats to commence clawback litigation and freeze bank accounts cannot constitute wrongful threats with respect to GWA.  (*See* FAC ¶ 41 (making clear that WMSA, OGI, WSO, and WMSF were not parties to and did not guarantee, grant any security interest, provide any offset, or receive any consideration in connection with the Strategic Relationship Agreement).)

Nonetheless, while "an action cannot amount to a wrongful threat if the party taking it interprets the contract in good faith to allow it," there is a lack of clarity whether the Jefferies Entities possessed the legal right to take the other threatened legal actions.  *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08 Civ. 11365 (RJH), 2010 WL 1257300 (S.D.N.Y. 2010), *aff'd*, 655 F.3d 136 (2d Cir. 2011).  While it may be that the Jefferies Entities possessed certain legal rights against GWA and WMSA, it is less clear whether the Jefferies Entities possessed the same rights against the remaining Debtors and non-debtor George Weiss.  The FAC alleges that the Jefferies Entities lacked such rights as none of the foregoing were a party to or guaranteed the obligations arising thereunder and there was otherwise no legal basis.  (FAC ¶ 111 ("Defendants had no legal right to take threatened enforcement actions against any of the remaining Debtors or their founder who were not parties to the Notes or Initial Forbearance Agreements."); *id.* (arguing that there was no legal basis for the Jefferies Entities to claw back compensation payments or to freeze bank accounts); *see also id.* ¶¶ 38–39 (noting there were no guarantees, security interests or rights of setoff under the Note Purchase Agreements or the Notes, including from OGI, WSO, and WMSF—none of whom were parties to the Note Purchase Agreements, the Notes or other related agreements); *id.* ¶ 41 (noting the same with respect to WMSA, OGI, WSO, and WMSF and the Strategic Relationship Agreement).)  It is also unclear whether there was any legal right for the Jefferies Entities to threaten to "ruin George Weiss's reputation in the industry" and file "fraud claims against him."  (*See id.* ¶ 58.)  The Jefferies Entities also do not shed light on any lawful basis to freeze bank accounts or claw back employee compensation payments as to the remaining Debtors other than a simple statement that "these things would have happened because of the Debtors' conduct."  (Reply Brief ¶ 16.)  With respect to the employee compensation payments in particular, the FAC alleges that none of the agreements

with the Jefferies Entities before the 2024 Forbearance Agreement "permitted the Defendants to control, limit, restrict or approve any such payments."  (FAC ¶ 57.)

Accordingly, neither the Jefferies Entities' threats to commence litigation to seek damages relating to alleged breaches of the Note Purchase Agreement and Notes as to GWA and WMSA nor their threats to initiate clawback litigation and freeze bank accounts as to GWA can constitute wrongful threats.  The Court, therefore, **GRANTS** the Motion in this limited respect and **DIRECTS** that Debtors amend Count VI of the FAC accordingly.  Whether the Jefferies Entities' remaining conduct actually constituted wrongful threats cannot be determined based on the pleadings alone.  At this juncture, however, the Debtors have pled sufficient facts that the Jefferies Entities engaged in actions that went beyond "a mere demonstration of financial pressure or unequal bargaining power."  *Interpharm,* 655 F.3d at 142.

#### b.  Threats Precluded the Exercise of Free Will

To demonstrate a preclusion of free will, a party must show that it would have suffered "irreparable harm" if the wrongful threats were to be carried out, and there are no adequate remedies at law.  *Davis*, 168 F. Supp. at 116 (citing *Dollar Dry Dock Savs. Bank v. Hudson Street Dev. Assocs.*, No. 92 Civ. 3737 (SAS), 1995 WL 412572, at *7 (S.D.N.Y. July 12, 1995) ("A threat to breach an enforceable contract can constitute duress only if the breach will cause irreparable harm to the threatened party and there are no adequate remedies at law.")); *see also Interpharm*, 2010 WL 1257300, at *10 (stating the same).

As noted, the Debtors viewed the Jefferies Entities' threatened actions collectively as the "certainty of loss of key personnel," the "collapse" of a potential third-party financing transaction, and the "demise of the companies" that would foreclose any opportunity for an orderly winddown and for the Debtors to comply with their fiduciary duties and obligations to regulatory agencies.  (FAC ¶ 60.)  It is against this backdrop of what the Debtors deem

41

"irreparable harm" that the Debtors contend that, they "along with founder and CEO George

Weiss, individually, were compelled to sign [the 2024 Forbearance Agreement] with

Defendants" as a result of the Jefferies Entities' threats.  (*Id.* ¶ 61.)

The Jefferies Entities argue, instead, that the Debtors acted out of their own free will and

otherwise had adequate legal remedies at their disposal.  (*See* Supporting Memorandum ¶ 49;

Reply Brief ¶ 17.)  However, they offer no support for their conclusory statement that the

Debtors acted out of their own free will and "self-interest" when entering into the 2024

Forbearance Agreement.  (*See id.*)  Moreover, their assertion that JSI's threatened breach of its

obligation to forbear through September 1, 2024 meant that the Debtors had other legal remedies

available to them, including a potential claim against JSI, is unpersuasive.  (*See id.* ¶ 15.)  As

discussed already, JSI only agreed to forbear from invoking its Trigger Redemption right, which

it did not seek to exercise and was not in breach of the July 2023 Initial Forbearance Agreement.

Accordingly, the Debtors have alleged sufficient facts that the Jefferies Entities' actions

precluded their free will at least with respect to OGI, WSO, and WMSF and WMSA in a limited

respect.  The Debtors were, at the time, concerned that "irreparable harm" would result if the

Jefferies Entities' carried out their threatened actions, and did not believe there was another

alternative as the Jefferies Entities effectively gave them what amounted to an ultimatum—sign

or else.

Notwithstanding, the Court is dubious whether the Debtors can successfully establish that

their free will was actually precluded.  These are highly sophisticated parties represented by

competent and similarly sophisticated counsel, and the notion that they were forced into entering

an agreement they would not otherwise have entered seems highly improbable.  However, while

the Court expresses its skepticism, it is not what is required for a Rule 12(b)(6) motion.

2.  <u>Null and Void for Lack of Consideration, Intent to Comply, and
    Countersignature</u>

Under New York law, the elements of contract formation are "an offer, acceptance of the

offer, consideration, mutual assent, and an intent to be bound." *Kasowitz, Benson, Torres &*

*Friedman, LLP v. Reade*, 950 N.Y.S.2d 8, 9 (App. Div. 2012), *aff'd*, 20 N.Y.3d 1082 (2013)

(indicating that a plaintiff seeking to establish the existence of an enforceable agreement must

show each of the foregoing) (quoting *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div.

2009)).  Here, Count VII, which the Jefferies Entities request that the Court dismiss, seeks a

declaration that the 2024 Forbearance Agreement is null and void because the agreement lacks

consideration, the Jefferies Entities did not intend to be bound, and the agreement was not

otherwise signed and returned.  (FAC ¶¶ 118–23.)  Each is addressed in turn.

### a.  *Lack of Consideration*

Consideration, in general, "consists of either a benefit to the promisor or a detriment to

the promisee." *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (App. Div. 2021) (quoting *Weiner*

*v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 444 (N.Y. 1982)).  "A valuable consideration, in the

sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one

party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by

the other." *Id.* (quoting *Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1891)).  Indeed, "[t]he

slightest consideration is sufficient to support the most onerous obligation." *Id.* (quoting

*Mencher v. Weiss*, 114 N.E.2d 177 (N.Y. 1953)).  "Under the traditional principles of contract

law, the parties to a contract are free to make their bargain, even if the consideration exchanged

is grossly unequal or of dubious value." *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095,

1097 (N.Y. 1993) (citations omitted).  "Absent fraud or unconscionability, the adequacy of

consideration is not a proper subject for judicial scrutiny." *Id.* (citation omitted).  Rather, "[i]t is

enough that something of 'real value in the eye of the law' was exchanged." *Id.* (citations

omitted); *see also In re 37-02 Plaza LLC*, 387 B.R. 413, 418 (Bankr. E.D.N.Y. 2008)

("Discerning the existence, rather than the adequacy, of consideration is the court's primary

task.").

Here, the Debtors have pled that the 2024 Forbearance Agreement is null and void for

lack of consideration because (i) the two-day forbearance period granted to GWA and WMSA

was "effectively meaningless by virtue of its duration"; (ii) the Jefferies Entities were under a

"preexisting obligation to not call the Notes through September 2024" pursuant to the July 2023

Initial Forbearance Letter; and (iii) no consideration was given to the OGI, WSO, and WMSF

who were "previously unobligated" under the Note Purchase Agreements, the Notes, or the

Initial Forbearance Agreements.  (FAC ¶ 121.)

With respect to GWA and WMSA specifically, the Debtors have failed to adequately

plead that the 2024 Forbearance Agreement lacks consideration.  *First*, "[i]t is settled that

forbearance is valuable consideration supporting the enforcement of an obligation."  *All Terrain*

*Properties, Inc. v. Hoy,* 705 N.Y.S.2d 350, 355 (App. Div. 2000); *see also Rogowsky v.*

*McGarry*, 865 N.Y.S.2d 670, 671 (App. Div. 2008) ("[F]orbearance from the assertion of a legal

right has long been held to constitute valid consideration.").  It is also a "settled principle of New

York contract law that courts will rarely if ever investigate the adequacy of the consideration

exchanged."  *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 593 (S.D.N.Y.

2009).  Indeed, "[u]nder New York law, forbearance of ***any length*** can constitute valid

consideration."  *Id.* at 593 (emphasis added) (citation omitted).  Accordingly, the duration of the

forbearance is irrelevant; rather, the focus is whether there was forbearance at all of a right the

Jefferies Entities possessed at the time.  The Debtors' reliance on such is, therefore, insufficient

44

to support a plausible claim that the 2024 Forbearance Agreement lacks consideration as to GWA and WMSA.

*Second*, as already discussed, JSI's obligation to forbear under July 2023 Initial Forbearance Agreement was limited solely to JSI exercising its right to affect a Trigger Redemption under the Note Purchase Agreements against GWA.  In contrast, under the 2024 Forbearance Agreement, JSI agreed to forbear from (i) "seeking relief or exercising any remedies" under the Bankruptcy Code, including, among other things, commencing an insolvency proceeding under the Bankruptcy Code against GWA, an assignment for the benefit of the creditors proceeding, a receivership, or other similar insolvency proceeding and (ii) filing an "Enforcement Action," which the 2024 Forbearance Agreement defines to be JSI's "right to immediately commence and enforcement action, suit, litigation, claim or other action" against GWA in connection with the past due amounts under the Notes and certain actions of the Debtors.  (2024 Forbearance Agreement ¶ 6; *id.* at 2.)  These were rights separate and apart from, and in addition to, JSI's right to affect a Trigger Redemption under the Note Purchase Agreements, which if triggered, enabled JSI to redeem the Notes, in whole or in part, at any time after the occurrence of certain events.  (*See, e.g.*, 2019 Note Purchase Agreement § 7.3.) Accordingly, the Debtors' contention that JSI was under a preexisting obligation to not call the Notes is also unsupported and not adequately pled.

However, with respect to OGI, WSO, and WMSF, the Debtors have adequately pled a plausible claim that the 2024 Forbearance Agreement lacks consideration.  As discussed, none of OGI, WSO, and WMSF were parties to the Note Purchase Agreements, the Notes, or any other related agreement with the Jefferies Entities, and none guaranteed, granted a security interest, provided for any offset, or received any consideration in connection with the foregoing.  (FAC

¶ 39.)  It is unclear whether the agreed-to forbearance under the 2024 Forbearance Agreement,

therefore, encompasses any rights JSI possessed against these entities.  The language of the

forbearance provision provides that JSI forbears from "seeking relief or exercising any remedies

under title 11 of the United States Code" and commencing an Enforcement Action, the latter of

which the 2024 Forbearance Agreement defines as being against GWA only.  (2024 Forbearance

Agreement at 2; *id.* § 6.)  The Jefferies Entities, effectively conceding this, argue that a contract

may nonetheless be supported by consideration "even if the consideration flows solely to a third

party."  (Reply Brief ¶ 20 (quoting *37-02 Plaza LLC*, 387 B.R. at 419)).  However, the Jefferies

Entities do not point to any benefits that flow to OGI, WSO, and WMSF from the Debtors' entry

into the 2024 Forbearance Agreement.

Accordingly, the Court **GRANTS** the Motion with respect to Count VII to the extent it

asserts a claim that the 2024 Forbearance Agreement is null and void for lack of consideration as

to GWA and WMSA because (i) the two-day forbearance period granted to GWA and WMSA

was "effectively meaningless by virtue of its duration" and (ii) the Jefferies Entities were under a

"preexisting obligation to not call the Notes through September 2024" pursuant to the July 2023

Initial Forbearance Letter.

### b.  *Lack of Intent to Comply*

The Debtors further allege that the 2024 Forbearance Agreement should be deemed null

and void as the Jefferies Entities' actions "further indicated that they had no intention of

complying" with its terms, including "subsequent continued correspondence and threat to

commence action against the Debtors and their employees."  (FAC ¶ 120.)  However, the

Jefferies Entities' actions taken after the Debtors signed the 2024 Forbearance Agreement

suggest otherwise.  Therefore, the FAC has not alleged sufficient facts to support a plausible

claim that the Jefferies Entities did not intend to comply with the terms of the 2024 Forbearance Agreement.

The Debtors entered into the 2024 Forbearance Agreement on February 12, 2024.  (*Id.* ¶ 1.)  The FAC states that the Defendants filed UCC-1 financing statements on February 12, 2024 and February 13, 2024, no later than one day after the Debtors signed, "in an effort to seek to perfect the security interests purportedly granted under the 2024 Forbearance Agreement."[17]  (*Id.* ¶ 66.)

Moreover, under the 2024 Forbearance Agreement, JSI was only required to forbear until the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default," subject to a possible extension of one business day.  (2024 Forbearance Agreement § 6.)  There is no indication that the forbearance period was extended.  (*See, e.g.*, FAC ¶ 62 (stating that the forbearance period was only for two days).)  At the conclusion of the two-day forbearance period, the FAC states that the Jefferies Entities delivered the first of two draft state court complaints on February 17, 2024, five days after the Debtors signed.  (*See id.* ¶¶ 68–69.)  In other words, the Jefferies Entities' delivery of the state court complaints only came after they fulfilled their agreement to forbear.

Accordingly, the Court **GRANTS** the Motion as to Count VII to the extent it alleges that the 2024 Forbearance Agreement should be declared null and void for the Jefferies Entities' lack of intent to comply.  The Jefferies Entities' objective actions as alleged in the FAC do not support a claim that they lacked an intent to comply.

---

[17]    As discussed below, under New York law, the 2024 Forbearance Agreement does not need to be countersigned in order for it to be enforceable so long as there is objective evidence showing that parties intended to be bound.

c.  *Lack of Countersignature*

"Under New York law, a contract need not be signed by either or both parties in order to

be enforceable." *Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am.,*

*Inc.*, 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012); *see also Pludeman v. N. Leasing Sys., Inc.*, 929

N.Y.S.2d 246, 248 (App. Div. 2011) ("We note that there is no legal requirement that a party's

signature appear at the end of a written agreement.").  "In the absence of a signed writing, parties

can demonstrate the existence of a contractual agreement by making a showing of the 'objective

manifestations of the intent of the parties as gathered by their expressed words and deeds.'"

*Asesores*, 841 F. Supp. 2d at 766 (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr.*

*Corp.*, 61 N.E.2d 999, 1001 (N.Y. 1977)); *see also Cotich v. Town of Newburgh*, 174 N.Y.S.3d

740, 742 (App. Div. 2022) ("[A]n unsigned contract may be enforceable, provided there is

objective evidence establishing that the parties intended to be bound." (quoting *Flores v. Lower*

*E. Side Serv. Ctr., Inc.*, 828 N.E.2d 593, 597 (N.Y. 2005)).

The Second Circuit articulated four factors for a court to consider when determining

whether parties intended to be bound "in the absence of a document executed by both sides":

> The court is to consider (1) whether there has been an express reservation
> of the right not to be bound in the absence of a writing; (2) whether there
> has been partial performance of the contract; (3) whether all of the terms of
> the alleged contract have been agreed upon; and (4) whether the agreement
> at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (citations omitted).  "No one

*Winston* factor is decisive, and the analysis ultimately hinges on the parties' intent demonstrated

through their objective communications and conduct."  *In re Motors Liquidation Co.*, 580 B.R.

319, 344 (Bankr. S.D.N.Y. 2018) (citations omitted).

Here, the FAC asserts a claim that the 2024 Forbearance Agreement should be deemed

null and void for the Jefferies Entities' failure to sign and return the agreement.  (FAC ¶¶ 120,

122.)  New York law, however, does not require an agreement to be countersigned in order to be

enforceable, and the Debtors do not point to anything showing that the parties agreed to such,

including language in the 2024 Forbearance Agreement itself.  *See, e.g.*, *Scheck v. Francis*, 260

N.E.2d 493, 494 (N.Y. 1970) ("It is well settled that, if the parties to an agreement do not intend

it to be binding upon them until it is reduced to writing and signed by both of them, they are not

bound and may not be held liable until it has been written out and signed.") (citations omitted).

Indeed, the Debtors fail to point to any language in the 2024 Forbearance Agreement that

explicitly requires full execution of the agreement before it is binding and effective.  *See Motors*

*Liquidation*, 580 B.R. at 351–52 (noting the plain language of the settlement agreement provided

that the agreement would be effective and binding when it was "fully executed by each of the

Parties").

        Moreover, "[e]ven where there is no ***explicit*** reservation by the parties not to be bound

until execution of a written agreement, the parties' language and conduct can nevertheless imply

the existence, or absence, of such an intent."  *Id.* at 345 (emphasis in original) (citing *Johnson v.*

*Fordham University*, No. 1:11-cv-04670 (ALC), 2016 WL 450424, at *4 (S.D.N.Y. Feb. 4,

2016)).  Here, as discussed, the Jefferies Entities took "objective" actions to show that they

intended to be bound by the 2024 Forbearance Agreement.  Indeed, as noted, the FAC states that

no later than one day after the Debtors signed the 2024 Forbearance Agreement, the Jefferies

Entities filed UCC-1 financing statements to perfect the security interests granted under the 2024

Forbearance Agreement.  (*Id.* ¶ 66.)

        Accordingly, the Court **GRANTS** the Motion as to Count VII to the extent it asserts a

claim that the 2024 Forbearance Agreement is null and void for lack of countersignature.

3.  Counts VI and VII

For the reasons discussed above, the Court **GRANTS** the Motion in part as to Counts VI and VII in part.  Count VI, which seeks recission of the 2024 Forbearance Agreement as a product of duress, should survive dismissal only with respect to OGI, WSO, and WMSF as is and WMSA with respect to the Jefferies Entities' threats of clawback litigation and the freezing of bank accounts.  Count VII—which seeks a declaration that the 2024 Forbearance Agreement is unenforceable for lack of consideration, intent to comply, and countersignature—should survive dismissal only with respect to lack of consideration as to OGI, WSO, and WMSF.

**B.  Avoidance of the 2024 Forbearance Agreement and the Security Interests**

The Debtors assert claims to avoid the 2024 Forbearance Agreement in its entirety and the Security Interests and guarantees arising thereunder as either a preferential or fraudulent transfer.  Each is addressed in turn.

1.  Avoidance of the 2024 Forbearance Agreement

*a.  Preferential Transfer Pursuant to 11 U.S.C. § 547(b)*

Section 547(b) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid any "***transfer*** of an interest of the debtor in property": (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables such creditor to receive more than it would have received if the case were a chapter 7 liquidation case, the transfer had not been made, and the creditor received payment of the debt to the extent provided by provisions under the Bankruptcy Code.  11 U.S.C. § 547(b) (emphasis added).  In establishing that a preferential transfer exists, it is generally the trustee who bears the burden of proving each of the foregoing elements by a preponderance of the evidence.  *See* 11 U.S.C. § 547(g) ("[T]he trustee has the burden of proving

the avoidability of a transfer under subsection (b) of this section."); *Lawson v. Ford Motor Co.*
*(In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996) (stating that the trustee bears the burden
of proving each of the elements by a "preponderance of the evidence").

Section 101(54) of the Bankruptcy Code defines "transfer" to be:

> (A) the creation of a lien;
>
> (B) the retention of title as a security interest;
>
> (C) the foreclosure of a debtor's equity of redemption; or
>
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with--
>
> > (i) property; or
> >
> > (ii) an interest in property.

11 U.S.C. § 101(54).  Generally, this definition should be construed "as broad as possible," and
what constitutes a transfer is a "matter of federal law."  5 COLLIER ON BANKRUPTCY ¶ 547.03
(quoting S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978) and citing *Barnhill v. Johnson*, 503
U.S. 393, 397 (1992)).

Here, the Debtors seek to avoid the 2024 Forbearance Agreement in its entirety as a
preferential transfer pursuant to 11 U.S.C. § 547(b).  (*See* FAC ¶ 90.)  Specifically, the FAC
alleges that the 2024 Forbearance Agreement constituted a "transfer of an interest of the Initial
Debtors in property" that was "made to, or for the benefit of, Defendants," who were creditors of
the Debtors, "for or on account of antecedent debts owed by certain of the Plaintiffs to
Defendants" when the "Initial Debtors were insolvent" and within 90 days prior to the Petition
Date.  (*Id.* ¶¶ 83–87.)  Moreover, the 2024 Forbearance Agreement, the Debtors contend,
enabled the Jefferies Entities to receive more than they would have if the "Initial Debtors' cases
was [sic] cases under chapter 7 . . . the [2024] Forbearance Agreement had not been made . . .

51

and Defendants received payment to the extent provided by provisions under the Bankruptcy

Code." (*Id.* ¶ 88.)

In support, the Debtors allege that the various transactions contemplated under the 2024

Forbearance Agreement constitute, "on the whole," transfers of the "Debtors' interests in

property to the Defendants." (Opposition Brief at 11.) Specifically, the FAC provides that,

"[t]he [2024] Forbearance Agreement, and the terms set forth therein, was a transfer of an

interest of the Initial Debtors in property."[18]  (FAC ¶ 83.)  These transactions "includ[e], among

other things, (i) the granting of a priority security interest in all of the Initial Debtors' assets, (ii)

the issuance of guarantees by each of the Initials [sic] Debtors (whether or not a party to the Note

Purchase Agreements, Notes, or [Strategic Relationship] Agreement), and (iii) an offset of

significant fees owed by JSI to GWA under the IMA." (*Id.*)  The Debtors maintain that these

"obligations and transfers to be avoided," which belong to them, "are the substance of the [2024]

Forbearance Agreement." (Opposition Brief at 11–12.)  Therefore, their "avoidance will have

the practical effect of invalidating the eve-of-bankruptcy transaction as a whole." (*Id.* at 12.)  In

light of this, the Debtors believe that the 2024 Forbearance Agreement can be avoided in its

entirety.

It may be that if the Court finds that each individual transaction under the 2024

Forbearance Agreement constitutes a preferential transfer, then the 2024 Forbearance Agreement

can be avoided in its entirety. However, certain of the transactions that the Debtors cite are not

"transfers," and the Debtors fail to account for all transactions and parties under the 2024

Forbearance Agreement, including the personal guarantee of non-debtor George Weiss and

WMSF who are parties to the 2024 Forbearance Agreement. The FAC, therefore, fails to plead

---

[18]    While the Opposition Brief refers to the Debtors and the Debtors' interests, the FAC refers only to the
Initial Debtors and excludes WMSF.

sufficient facts to establish that the specific transactions and parties that the Debtors highlight

constitute the entire essence of the 2024 Forbearance Agreement and would justify avoiding the

entire agreement "as a whole."

*First*, the FAC cites to, among other things, the "issuance of joint and several guarantees

by each of the Initials [sic] Debtors" as one of the transactions that constitutes a "transfer of an

interest of the Initial Debtors in property." (FAC ¶ 83.) Guarantees, however, are not generally

considered "transfers" for purposes of 11 U.S.C. § 101(54) but rather "obligations." *See, e.g., In

re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005) ("[T]he Guaranty gave

[the defendant] a chose in action against [the debtor], conditioned on the default of the [primary

obligor]. It did not grant [the defendant] any interest in or right to [the debtor's] property. As

such, it was an 'obligation' rather than a 'transfer' . . . ."); *Covey v. Com. Nat'l Bank*, 960 F.2d

657, 661 (7th Cir. 1992) (noting that while notes or guarantees are not "transfers" under 11

U.S.C. § 101(54), both "note and guarantee are obligations") (citations omitted).

*Second*, as the Jefferies Entities argue, the 2024 Forbearance Agreement also includes

(i) a personal guarantee by George Weiss, a non-debtor, of "the accuracy of the representations

made by, and the performance of the agreements of, the [Debtors]" as well as (ii) an agreement

by George Weiss that:

> [H]e shall take all actions within his control, including by exercising all of
> his voting, governance, management and other rights and powers with
> respect to each of the other [Debtors], any of their subsidiaries and any of
> his personal or his family's trusts to cause such persons to comply with the
> terms of [the 2024 Forbearance Agreement].

(2024 Forbearance Agreement § 9.) As discussed, the Bankruptcy Code only permits the

avoidance of transfers of interests in a debtor's property or a debtor's incurrence of an obligation,

subject to certain requirements. As the 2024 Forbearance Agreement also provides for the

personal guarantee of non-debtor George Weiss, the 2024 Forbearance Agreement cannot be

avoided in its entirety solely based on the transactions the Debtors have cherry-picked as collectively representing the "substance of the [2024] Forbearance Agreement." (*See* Opposition Brief at 12.)

The Debtors argued at the September 11, 2024 hearing that the 2024 Forbearance Agreement may avoided notwithstanding George Weiss's guarantee because his guarantee was only a "performance guarantee of obligations of these parties under the [2024 Forbearance Agreement], not of the obligations under the loans or any other monies that are owed." (Sept. 11, 2024 Hr'g Tr. at 20:20–24; *see also id.* 20:24–25 (stating that Weiss's personal guarantee was "solely a performance guarantee rather than a payment guarantee").) In support of this, counsel to George Weiss referred the Court to three cases: *Caldor, Inc. v. Mattel, Inc.*, 817 F. Supp. 408 (S.D.N.Y. 1993); *Solco Plumbing Supply, Inc. v. Hart*, 999 N.Y.S.2d 126 (App. Div. 2014); and *Key Bank of Long Island v. Burns*, 556 N.Y.S.2d 829 (App. Div. 1990).[19] (*See* Sept. 11, 2024 H'rg Tr. at 49:10–15.)

However, none of these cases make a distinction between a performance guarantee versus a payment guarantee.[20] What is consistent between each of these cases, though, is the notion that

---

[19]    At the September 11 hearing, Debtors' counsel disclosed that the Jefferies Entities sued George Weiss individually in District Court in the Southern District of New York where a motion to dismiss is currently pending. (Sept. 11, 2024 Hr'g Tr. at 21:4–12; *see* Defendant George Weiss's Motion to Dismiss Plaintiffs' Complaint and, In Addition or as an Alternative, for a Stay of the Action, Jefferies Strategic Invs. v. Weiss, No. 1:24-cv-04369 (AH) (S.D.N.Y. June 7, 2024), ECF No. 15 (the "Weiss Motion to Dismiss")). Counsel indicates that these three cases were cited in the memo to support the "essential argument" in the Weiss Motion to Dismiss that George Weiss's guarantee was a "performance guarantee solely of this [2024 Forbearance Agreement]." (Sept. 11, 2024 Hr'g Tr. at 21:4–12, 49:10–15.) In the Weiss Motion to Dismiss, George Weiss argues that (i) the 2024 Forbearance Agreement generally separates him from the Debtors; (ii) he is not specifically identified in section 3 of the 2024 Forbearance Agreement; (iii) section 9 could have, but does not refer to, "Guaranteed Obligations"; (iv) the "agreements" mentioned in section 9 are a reference to the agreements listed in section 2; and (v) a personal guarantee of $100 million by implication would be unreasonable. (*See generally* Weiss Motion to Dismiss.)

[20]    The Court will not address the underlying merits of the Weiss Motion to Dismiss, which is pending before Judge Hellerstein in the Southern District of New York. However, as the parties have raised this particular issue in support of their contention that the 2024 Forbearance Agreement may be voided notwithstanding the personal guarantee of George Weiss, a non-debtor, the Court notes that these three cases are distinguishable from the case at

a guarantee agreement under New York law should be narrowly construed in accordance with its

terms.  *See Caldor*, 817 F. Supp. at 410–11 (citations omitted) ("A guarantee agreement is to be

construed like other contracts in order to give effect to the parties' intentions . . . [and] must be

strictly construed according to the terms of the agreement."); *Solco*, 999 N.Y.S.2d at 800 ("The

terms of a guaranty are to be strictly construed . . . and a guarantor should not be found liable

beyond the express terms of the guaranty . . . ." (citations omitted)); *Key Bank*, 556 N.Y.S.2d at

503 ("It is well settled that the liability of a guarantor is to be narrowly construed and cannot be

extended by construction beyond the plain and explicit language of the contract.") (citations

omitted)).

In general, New York courts view guarantees as contracts, and in interpreting them, will

"look first to the words the parties used."  *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*,

812 N.E.2d 936, 939 (N.Y. 2004).  A "court should not read a contract so as to render any term,

phrase, or provision meaningless or superfluous, but should give effect to all of the contract's

provisions."  *Solco*, 123 A.D.3d at 800 (citations omitted); *see also Bombay Realty Corp. v.

Magna Carta, Inc.*, 790 N.E.2d 1163 (N.Y. 2003) (noting generally that courts will look to a

contract as a whole to determine its meaning, so that one section does not conflict with another).

Applying these principles here, a strict construction of the 2024 Forbearance Agreement,

even in Weiss's favor, makes clear that Weiss's performance guarantee was also a guarantee of

payment.  Pursuant to section 9 of the 2024 Forbearance Agreement, George Weiss personally

---

hand.  At issue in *Caldor* was the guarantee of "payment of any indebtedness . . . owing to [defendant]," which
explicitly provided for the guarantee of payment.  *Caldor*, 817 F. Supp. at 409.  Meanwhile, *Key Bank* dealt with the
question whether a guarantee of debts and obligations of a corporation who subsequently became a guarantor on a
note issued by an individual could be interpreted as imposing an obligation on defendants who served as guarantors
of such individual's debts.  *See generally Key Bank*, 556 N.Y.S.2d 829.  Finally, the *Solco* court, in dealing with a
"financially interested" guarantor's "guarantee [of] payment . . . of all indebtedness of the . . . customer," focused
solely on whether the "financially interested" language in the guarantee created a contingency and whether this
contingency was satisfied.  *Solco*, 999 N.Y.S.2d at 799, 801.

guaranteed the "performance of the ***agreements of the [Debtors] hereunder***," including taking "all actions within his control . . . to cause such persons to comply with terms of [the] Agreement." (2024 Forbearance § 9 (emphasis added).) These agreements include, among other things, each of the Debtors' (other than GWA's) irrevocable and unconditional guarantee of the "prompt and complete payment and performance by GWA and each other [Debtor] when due . . . of the Guaranteed Obligations . . . until the Guaranteed Obligations are paid in full." (*Id.* § 3(a); *see also id.* §§ 1, 10(d) (making clear that the 2024 Forbearance Agreement was intended to address, among other things, the amounts past due under the Note Purchase Agreements, the Notes, and the Optional Redemption Notice).) "Guaranteed Obligations" is defined under the agreement to encompass "all the obligations of GWA and each other [Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship Agreement] and this Agreement," among other things. (*Id.*; *see also id.* § 10(d) ("This Agreement addresses the Past Due Obligations [on the Notes pursuant to the Note Purchase Agreements, the Notes themselves, and the Optional Redemption Notice] and the amounts in the IMA referenced in Section 8.").)

Indeed, courts have found that guarantees of performance can include guarantees of payments even when the language of the guarantee does not explicitly provide for such. *See, e.g.*, *Am. Trading Co. v. Fish*, 364 N.E.2d 1309, 1313 (N.Y. 1977) (finding that since defendant guaranteed performance of the terms and conditions of the agreement that required payment by means of trade acceptances, the guarantee "must be interpreted as including payment according to and as provided in the agreement") (citation omitted); *Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG), 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) (concluding that a personal guarantee of performance included a guarantee of payment despite the lack of explicit language providing for such since "it would be challenging to prescribe some

other meaningful purpose the Guaranty was intended to serve").  Accordingly, the Court is
unpersuaded.

*Third*, the FAC was amended to only include transfers of the Initial Debtors and exclude
WMSF, a fellow Debtor, who was also a party to the 2024 Forbearance Agreement.  As set forth
in the 2024 Forbearance Agreement, WMSF also granted a security interest in all of its assets
and was also party to the joint and several guarantee referenced above.  (*See Plaintiffs'*
*Memorandum of Law in Support of Motion for Leave to Amend Adversary Complaint*, ECF Doc.
# 13, Ex. B (blackline of FAC against prior iteration).)  The Debtors have not offered anything in
the FAC to support how the 2024 Forbearance Agreement, which involves other transactions and
parties, can be avoided in its entirety based solely on the parties and transactions that the Debtors
have highlighted.  The FAC, therefore, fails to plead sufficient facts to support a plausible claim
for relief.

Alternatively, the FAC pleads that, to the extent the 2024 Forbearance Agreement is not
avoided in its entirety, "all provisions therein which purport to transfer property of the Initial
Debtors should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. §
547(b)."  (FAC ¶ 91.)  Indeed, the Jefferies Entities have indicated that Count I should survive
dismissal to the extent it asserts a preference claim that seeks to avoid the granting of security
interests under the 2024 Forbearance Agreement with such relief duplicative of the relief sought
in Count III.  (*See* Sept. 11, 2024 Hr'g Tr. at 18:2–9 ("So, we would agree that Count 1, to the
extent that it asserts a preference claim seeking to avoid the granting of security interests has
been sufficiently alleged.  I think the same is true under Count 3.  I think that that is it.").)

However, the FAC does not identify which specific provisions purport to transfer
property of the Initial Debtors.  Paragraph 83 of the FAC, which lists the transactions the Debtors

believe render the 2024 Forbearance Agreement a "transfer of an interest of the Initial Debtors in

property," includes the language "among other things," suggesting that they do not represent the

universe of all transactions.  It is, therefore, unclear what alternative relief the Debtors are

actually seeking and, in any event, survival of Count I in the limited respect that the Jefferies

Entities are requesting would be duplicative of the surviving relief sought in Count III, which is

discussed in greater detail below.  *See, e.g.*, *Sands Harbor Marina Corp. v. Wells Fargo Ins.*

*Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016) ("Duplicative claims shall be

dismissed when they are based on identical conduct and seek the same relief." (citing *Paladini v.*

*Capossela, Cohen, LLC*, No. 11–CV–2252, 2012 WL 3834655, at *6 (S.D.N.Y. Aug. 15,

2012))).

Accordingly, the Court **GRANTS** the Motion as to Count I and **DISMISSES** it in its

entirety for failure to state a claim upon which relief can be granted.

> b. *Fraudulent Transfer and Obligation Pursuant to 11 U.S.C. §*
> *548(a)(1)(B)*

Section 548(a)(1)(B) provides, in relevant part, that a trustee may avoid:

> [A]ny ***transfer*** . . . of an interest of the debtor in property, or any ***obligation***
> . . . incurred by the debtor, that was made or incurred on or within 2 years
> before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily— . . .
>
> (B)
>
>> (i) received less than a reasonably equivalent value in exchange for
>> such transfer or obligation; and
>>
>> (ii)
>>
>>> (I) was insolvent on the date that such transfer was made or such
>>> obligation was incurred, or became insolvent as a result of such
>>> transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

Thus, to prevail on a constructive fraudulent conveyance claim under the Bankruptcy Code, a trustee must show, *inter alia*, that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(i). "The heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent." *Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 225 (Bankr. S.D.N.Y. 2011) (citing *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801–02 (Bankr. S.D.N.Y. 2005)). "As the party seeking to avoid the transaction, the Trustee bears the burden of proof by a preponderance of the evidence" on all elements of a claim for constructive fraudulent conveyance under § 548(a)(1)(B). *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999) (citation omitted).

However, unlike the word "transfer," which is defined in the Bankruptcy Code, the term "obligation" is not, and this Court has recognized that the words mean different things. *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 445 (Bankr. S.D.N.Y. 2012) (citing examples from other jurisdictions, involving among other things, sections 547 and 548, which "confirm that the words 'transfers' and 'obligations' have different meanings and may be distinguished in construing other sections of the Bankruptcy Code"); *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 429 (Bankr. S.D.N.Y. 2011) ("The distinction between a transfer and the incurrence of an

obligation has also been recognized in the case law.").  Presumably, the word "obligation" under the Bankruptcy Code means "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract." *Asia Glob*, 333 B.R. at 203 (alteration in original) (quoting BLACK'S LAW DICTIONARY 1104 (8th ed. 2004)).  "In most situations, . . . 'obligation' will impose a 'debt' on the obligor, and give a 'claim' to the obligee." *Id.* (footnote omitted).

Here, the Debtors also seek to avoid the 2024 Forbearance Agreement in its entirety as a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(1)(B).  (*See* FAC ¶ 97.)  Specifically, the FAC alleges that the 2024 Forbearance Agreement constitutes a "transfer[] of an interest of the Debtors in property, or an incurrence of an obligation by the Debtors" that was made within 2 years prior to the Petition Date and "to, or for the benefit of, the Defendants" without the Debtors receiving reasonably equivalent value in exchange.  (*See id.* ¶¶ 93–96.)  As with Count I, the Debtors cite the same transactions as "transfers of an interest of the Debtors in property, or an incurrence of an obligation by the Debtors" that, "***among other things***," collectively render the 2024 Forbearance Agreement a constructive fraudulent conveyance: "(i) the granting of a priority security interest in all of Plaintiffs' assets, (ii) the issuance of joint and several guarantees by each of the Debtors . . . and (iii) an offset on any fees that JSI owes to GWA or any other Debtor under the IMA."  (*Id.* ¶ 95 (emphasis added).)

However, the plain language of the 2024 Forbearance Agreement itself provides that:

> Each [of the Debtors] and [George] Weiss acknowledges and agrees that it is receiving a ***direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement.***  Each [Debtor] and [George] Weiss agrees that it shall not, nor shall it cause, directly or indirectly, any person controlled by, or under common control with, it, to take any action inconsistent with the

> terms of this Agreement.  Each party represents and warrants that it has full
> power and authority to enter into and perform this Agreement, and that the
> person executing this Agreement on behalf of that party has been properly
> authorized and empowered to enter into this Agreement and to bind that
> party hereto.

(2024 Forbearance Agreement § 10(c) (emphasis added).)  Thus, the Debtors explicitly agreed

that the transactions provided under the 2024 Forbearance Agreement and all its terms constitute

reasonably equivalent value for the benefit the Debtors are receiving.

Moreover, as discussed with Count I, the Debtors fail to account for the personal

guarantee and agreement of non-debtor George Weiss and, therefore, do not account for *all*

transactions under the 2024 Forbearance Agreement.  Guarantees, as discussed above, constitute

an "obligation."  Since the 2024 Forbearance Agreement also encompasses the obligations of

other non-debtor parties, and section 548(a)(1)(B) only permits the avoidance of, among other

things, obligations "incurred *by the debtor*," the 2024 Forbearance Agreement cannot be avoided

in its entirety based solely on the transactions the Debtors highlight.  11 U.S.C. § 548(a)(1)(B)

(emphasis added).  Therefore, as with Count I, the FAC fails to sufficiently plead how the

transactions the Debtors cherry-picked constitute the entire thrust of the agreement and warrant

avoidance of the agreement in its entirety.

The Jefferies Entities also highlight that the FAC states that the 2024 Forbearance

Agreement "was for or on account of antecedent debts owed by certain of the Plaintiffs to

Defendants."  (FAC ¶ 85.)  This, the Jefferies Entities contend, is a concession that the "transfer"

was made for reasonably equivalent value and therefore, that requirement cannot be satisfied.

(Supporting Memorandum ¶ 42.)  Section 548(d)(2)(A) defines "value" as being "property, or

satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A).

Generally, transfers made on account of antecedent debt are presumed to have been made "for

value."  *See O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460 B.R. 379, 388 (Bankr. S.D.N.Y.

2011) (stating that where "the transfers are viewed as paying an antecedent debt . . . it is presumed the transfers were made 'for value'").  "With this type of value, something is exchanged or given for the purpose of reducing an obligation or debt already incurred and outstanding" such that "[p]ayment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given."  5 COLLIER ON BANKRUPTCY ¶ 548.03.  As the FAC already fails to adequately plead that the 2024 Forbearance Agreement can be avoided in its entirety as a fraudulent conveyance, the Court need not reach this issue as to Count II.

Accordingly, the Court **GRANTS** the Motion as to Count II for failure to state a claim upon which relief can be granted.

2.  <u>Avoidance of the Security Interests and Guarantees as a Fraudulent Transfers and Obligations Pursuant to 11 U.S.C. § 548(a)(1)(B)</u>

The Debtors also seek, on a more limited basis, avoidance of the Security Interests, including any UCC-1 filings in furtherance thereof, and guarantees granted under the 2024 Forbearance Agreement as preferential transfer and/or fraudulent conveyance.  However, as the Jefferies Entities only seek dismissal of this Count to the extent it asserts a claim for constructive fraudulent conveyance, this Opinion does not address the Debtors' claim seeking avoidance of the Security Interests and guarantees as preferential transfers pursuant to 11 U.S.C. § 547(b).

The FAC alleges that the Security Interests and guarantees granted under the 2024 Forbearance Agreement constitute "transfers of property of the Debtors' estates, and/or an incurrence of an obligation of the Debtors' estates, all without fair or reasonable consideration therefor, and enabled Defendants to receive more than they would receive if (a) Plaintiffs' cases was [sic] cases under chapter 7 of the Bankruptcy Code, (b) the [2024] Forbearance Agreement and [] Security Interests and guarantees had not been made, and (c) Defendants received

payment of such debt to the extent provided by the provisions of the Bankruptcy Code." (FAC ¶ 100.)

Again, the Debtors explicitly agreed that the Security Interests and the guarantees provided under the 2024 Forbearance Agreement constitute "reasonably equivalent value" for the benefit the Debtors are receiving. (*See* 2024 Forbearance Agreement § 10(c) ("Each [of the Debtors] and [George] Weiss acknowledges and agrees that it is receiving a direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, ***including the guaranty provided herein and the security interests granted herein***, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement." (emphasis added)).

Additionally, as with Count II, the Jefferies Entities contend that the FAC provides that the 2024 Forbearance Agreement, including the Security Interests and guarantees, were "for or on account of antecedent debts owed by certain of the Plaintiffs to Defendants." (Supporting Memorandum ¶ 43 (quoting FAC ¶ 85).) Section 10(d) of the 2024 Forbearance Agreement confirms this, stating that "[t]his Agreement addresses the Past Due Obligations and the amounts under the IMA referenced in Section 8." (2024 Forbearance Agreement § 10(d).) "Past Due Obligations" is defined as the amounts due and owing under the Notes as calculated therein. (*See id.* § 1.) However, as the plain language of the 2024 Forbearance Agreement itself provides that the Security Interests and the guarantees thereunder constitute "reasonably equivalent value for the benefit [the Debtors and George Weiss are] receiving," the Court need not reach this.

Accordingly, in light of the foregoing, the Court **GRANTS** the Motion as to Count III, which only seeks dismissal of Count III to the extent it asserts a claim for constructive fraudulent conveyance.

3. <u>Claims Seeking Contingent Relief</u>

a. *Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551*

The FAC also asserts a claim pursuant to section 551 of the Bankruptcy Code, seeking to preserve the value of the interests and obligations incurred and/or transferred under the 2024 Forbearance Agreement, including the Security Interest and guarantees, for the benefit of Plaintiffs' estates. (FAC ¶ 104.) In support, the FAC pleads that such interest and obligations are property of the Debtors' estates. (*Id.* ¶ 103.)

Section 551 provides that "[a]ny ***transfer avoided*** under section . . . 547 [or] 548 . . . of this title . . . is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551 (emphasis added). In other words, as both the Debtors and the Jefferies Entities acknowledge, relief is contingent upon a transfer having been avoided in the first instance pursuant to one of the enumerated sections of the Bankruptcy Code. (*See* Supporting Memorandum ¶ 67 (stating that section 551 provides a remedy once a transfer is deemed avoidable); Opposition Brief at 24 (stating that this provision "remains conditioned upon any of the alleged avoidable transfers being upheld").) The Jefferies Entities argue, therefore, that this claim cannot stand alone as an independent cause of action. (*See* Supporting Memorandum ¶ 8.) However, there is no reason why such a claim cannot be asserted when there are surviving claims that potentially offer a basis for the contingent relief sought, and the FAC otherwise alleges sufficient facts to support a plausible claim for such relief.

Therefore, in light of the dismissal of Counts I and II in their entirety and Count III to the extent it seeks to avoid the Security Interests and guarantees as constructive fraudulent conveyances, the Court **GRANTS** the Motion as to Count IV, in part. Specifically, Count IV survives dismissal only to the extent it seeks relief under section 551 as to the avoidance of the Security Interests and guarantees as preferential transfers, the surviving claim under Count III.

64

The Court also **DIRECTS** the Debtors to amend the FAC to make explicit that the relief sought in this Count is contingent on a finding that the Debtors are entitled to relief under sections 547 or 548 of the Bankruptcy Code as that is not clear. As it is currently drafted, it states that the Debtors are entitled to relief under section 551 of the Bankruptcy Code because the "interest and obligations incurred and/or transferred under the [2024] Forbearance Agreement . . . are property of Plaintiffs' estates." (FAC ¶ 103.)

> b. *Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)*

Similarly, the FAC asserts a claim pursuant to 11 U.S.C. § 550(a) which, after avoidance of a transfer pursuant to one of the enumerated provisions, permits a trustee to recover the property or the value of the property transferred. Specifically, section 550(a) provides, in relevant part, that:

> (a)     Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547 [or] 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1)     the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2)     any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

The FAC alleges that the Debtors are "entitled to avoid the [2024] Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 547(b) as a preferential transfer and the [2024] Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 548(a)(1)(B) as a fraudulent transfer." (FAC ¶ 106.) The FAC contends this is warranted as the Jefferies Entities were "initial transferee[s] of one or more of the interests and obligations incurred and/or transferred

under the [2024] Forbearance Agreement, the immediate or mediate transferee of such initial

transferee, or the person for whose benefit the [2024] Forbearance Agreement was made." (*Id.* ¶

107.)  The Debtors, therefore, argue that they are "entitled to avoid the [2024] Forbearance

Agreement, including the [] Security Interests and guarantees" pursuant to 11 U.S.C. § 550(a).

(*Id.* ¶ 108.)

The Jefferies Entities do not dispute that they were initial transferees but instead contend,

as with Count IV, that this claim must be dismissed because it cannot survive as an independent

cause of action.  (*See* Supporting Memorandum ¶ 67.)  However, the FAC makes clear that the

relief they are seeking is predicated on the Debtors' position that they are "entitled to avoid the

[2024] Forbearance Agreement, and any security interests and guarantees granted therein,"

pursuant to sections 547 and 548 of the Bankruptcy Code.  (FAC ¶ 106.)  Again, there is no

reason why such a claim cannot be asserted when there are surviving claims that potentially offer

a basis for the contingent relief sought, and the FAC otherwise alleges sufficient facts to support

a plausible claim for such relief.

Therefore, for the same reasons as Count IV, the Court **GRANTS** the Motion as to Count

V, in part, and permits Count V to survive dismissal only to the extent it seeks relief under

section 550 as to the avoidance of the Security Interests and guarantees as preferential transfers,

the surviving claim under Count III.

### 4.   Counts I, II, III, IV, and V

For the reasons discussed, the Court **GRANTS** the Motion as to Counts I, II, and III as

follows: the Court **DISMISSES** Counts I and II in their entirety and **GRANTS** the Motion as to

Count III and **DISMISSES** Count III only to the extent it asserts a claim for constructive

fraudulent conveyance.  Consistent with this, the Court **GRANTS** the Motion as to Counts IV

and V, in part, and permit such Counts to survive dismissal to the extent they seek relief in the

event the Security Interests and the guarantees arising under the 2024 Forbearance Agreement
are found to constitute preferential transfers under 11 U.S.C. § 547(b).

### C. Avoidance of the Alleged Avoidable Transfers

The Debtors assert claims that seek to avoid the Alleged Avoidable Transfers as either
preferential and/or constructive fraudulent transfers, as applicable.  Each is addressed in turn.

          1.   The $3 Million Alleged Avoidable Transfer as a Preferential Transfer
               Pursuant to 11 U.S.C. § 547(b)

The FAC asserts a claim that seeks the avoidance of OGI's February 15, 2024 payment of
$3 million to JSI on GWA's behalf as an avoidable preference under section 547(b) of the
Bankruptcy Code, which was made during the Preference Period.  (FAC ¶¶ 71, 125.)  The
Debtors allege that the payment, which constitutes a transfer of an interest of the Debtors in
property, was made (i) to the Jefferies Entities who were creditors at the time; (ii) to, or for the
benefit of, the Jefferies Entities as it "either reduced or fully satisfied [debt(s)] then owed by
Plaintiffs to Defendants"; (iii) for or on account of antecedent debts owed; (iv) while the Debtors
were insolvent and within 90 days of the Petition Date; and (v) enabled the Defendants to receive
more than they would have if the cases were in chapter 7, such payment had not been made, and
the Defendants received payment to the extent provided by the Bankruptcy Code.  (*Id.* ¶¶ 126–
32.)  Moreover, the Debtors further allege that the Jefferies Entities were "either the initial
transferee of the $3 million . . . or were the immediate or mediate transferee of the initial
transferee."  (*Id.* ¶ 133.)

The Jefferies Entities argue that this claim should be dismissed since (i) the FAC fails to
plead facts that show that, as result of the $3 million payment, JSI received more than it would
have in a hypothetical chapter 7 (Supporting Memorandum ¶ 57); (ii) the payment was pursuant
to a "guarantee issued by OGI," which is not a "transfer [that] can he [sic] avoided as a

preferential transfer" (Reply Brief ¶ 26); and (iii) OGI's debt to the Jefferies Entities is not

otherwise in dispute (*id.* ¶ 27.).[21]

The FAC pleads that at the time OGI made the payment on behalf of GWA, OGI had no

obligation to JSI for any payment except with respect to its obligations under the 2024

Forbearance Agreement, and GWA had other creditors to which it owed obligations.  (FAC ¶

71.)  "In either case," the FAC contends, "JSI received more than it would have received in a

chapter 7 proceeding."  (*Id.*)  However, as the Jefferies Entities correctly note, the FAC does not

offer anything other the foregoing conclusory allegation.  (*See* Supporting Memorandum ¶ 59.)

There is nothing in the FAC concerning GWA's, OGI's, or any other Debtor's assets or

liabilities as of the Petition Date that would enable the Court to determine whether JSI received

more than it would have if the Debtors' cases were in chapter 7.  Whether GWA had other

creditors to which it owed obligations only partially sheds light on whether OGI's $3 million

payment to JSI was more than what JSI could have recovered from OGI in a hypothetical chapter

7 proceeding.

The FAC suggests that OGI's guarantee obligation to pay on GWA's behalf in

connection with the Notes stems from the 2024 Forbearance Agreement.  Section 3 of the 2024

Forbearance Agreement provides that "[e]ach [Debtor] (other than GWA) hereby irrevocably

and unconditionally guarantees to each of JSI and LAM Holdings . . . as a primary obligor the

***prompt and complete payment and performance by GWA and each other [Debtor] when due*** of

the Guaranteed Obligations."  (2024 Forbearance Agreement § 3(a) (emphasis added).)

"Guaranteed Obligations" is defined to include "all the obligations of GWA and each other

---

[21]     The Jefferies Entities also argue in the Reply Brief that the Debtors admitted that OGI's guarantee was
made on account of antecedent debts such that it was for reasonably equivalent value and cannot be avoided as a
fraudulent transfer.  (Reply Brief ¶ 26.)  However, as the Debtors are seeking relief here under section 547(b), this
argument will not be addressed in this section.

[Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement." (*Id.*)  Therefore, JSI could also have sought payment from the other Debtors, but the FAC fails to plead sufficient facts to even make a plausible determination whether this could be the case.  Thus, this reason alone is enough to conclude that the FAC has failed to sufficiently plead facts that support a plausible claim for relief.

Accordingly, the Court **GRANTS** the Motion as to Count VIII.

### 2.  The $20 Million in Alleged Avoidable Transfers as Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B)

As an initial matter, it is unclear how much the Debtors are actually seeking to avoid as constructive fraudulent transfers since the FAC and Opposition Brief, both of which were filed by the Debtors, refer to different amounts.  Specifically, the FAC seeks a money judgment for $20 million in alleged avoidable fraudulent transfers, which includes the $3 million alleged preferential payment from OGI to JSI.  (*See* FAC ¶ 4 ("Plaintiffs seek a money judgment relating to avoidable fraudulent transfers in the aggregate sum of $20,000,000 . . . ."); *see also id.* ¶ 77 ("The Debtors are seeking to avoid all applicable [Alleged] Avoidable Transfers of an interest in any of the Debtors' property made by the Debtors to Defendants within the Preference Period and the Fraudulent Conveyance Period.").)  Meanwhile, the Debtors, in their Opposition Brief, make no mention of the $20 million figure and state, instead, that the FAC is seeking to avoid $17 million in payments made to the Defendants as fraudulent transfers.  (*See* Opposition Brief at 21–22 ("During the two years prior to the Petition Date, the Debtors were caused to pay an aggregate sum of $17 million to Defendants.  The [FAC] alleges that these [Alleged] Avoidable Transfers were made for less than reasonably equivalent value.").)  Note that the latter figure of $17 million is consistent with what the Jefferies Entities have stated in their Supporting Memorandum and Reply Brief.  (*See, e.g.*, Supporting Memorandum ¶ 7 ("[T]he Debtors seek to

69

avoid, as constructive fraudulent transfers, $17 million in payments that were made to JSI under

the Notes.").)  For purposes of this Opinion, however, the Debtors' original figure of $20 million

(and the transfers that comprise it) will serve as the basis for the discussion below as that is the

figure that is used in the FAC.

The FAC asserts a claim to avoid the Alleged Avoidable Transfers in the collective

amount of $20 million as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).  (FAC ¶

139.)  Specifically, the FAC alleges that these transfers were made within 2 years of the Petition

Date to, or for the benefit of, the Defendants.  (*Id.* ¶¶ 136–37.)  Moreover, in exchange for these

transfers, the Debtors did not receive "reasonably equivalent value" because "(a) . . . the value of

the services and/or goods received was in fact less than the [Alleged] Avoidable Transfers or

(b) the Debtors that received such goods and/or services were not the parties (*i.e.*, Plaintiffs) that

had incurred the debt, and Plaintiffs were: (i) insolvent on the dates of the [Alleged] Avoidable

Transfers or became insolvent as a result of the [Alleged] Avoidable Transfers; and/or

(ii) engaged in business or a transaction for which any property remaining with Plaintiffs was an

unreasonably small capital at the time of, or as a result of, the [Alleged] Avoidable Transfers;

and/or (iii) Plaintiffs intended to incur, or believed that Plaintiffs would incur, debts that would

be beyond Plaintiffs' ability to pay as such debts matured."  (*Id.* ¶ 138.)

As set forth in the FAC, "[o]n information and belief, the [Alleged] Avoidable Transfers

were ***on account of an antecedent debt*** or were not prepayments for goods and/or services

subsequently received."  (*Id.* ¶ 75 (emphasis added).)  Nonetheless, the Debtors maintain that

such transfers were for less than "reasonably equivalent value" as they were paid as a result of,

among other things:

> (i) [A] manipulated acceleration of the negotiated Maturity Dates under the
> Notes, (ii) a manufactured or immaterial covenant default under the Notes

>    such that the purported forbearance was illusory, (iii) "bad faith" by the
>    Defendants in their dealings with the Debtors, including with full
>    knowledge of the Debtors' financial condition, while at the same time
>    continuing to invest, and invest their clients' money, with the Debtors'
>    managed funds, and market the Debtors' managed funds to their clients, and
>    (iv) in breach of the Initial Forbearance Agreements.

(*Id.* ¶ 76.)  The foregoing, the Debtors argue, supports a finding that the FAC "adequately alleges

material facts which establish (or may establish) that the Debtors ***did not receive what was***

***bargained for*** under the Note Purchase Agreements and Notes."  (Opposition Brief at 23

(emphasis in original).)

However, as already discussed, transfers made on account of antecedent debt are

presumed to have been made "for value."  *See Trinsum*, 460 B.R. at 388 (stating that where "the

transfers are viewed as paying an antecedent debt . . . it is presumed the transfers were made 'for

value'").  In such an instance, the reasonably equivalent value requirement cannot be satisfied

because "the transfers are considered 'for value' under the statute."  *Id.* at 388–89.  Therefore,

the Debtors' admission that the Alleged Avoidable Transfers were "on account of antecedent

debt" is alone sufficient to determine that the FAC fails to sufficiently plead the "less than

reasonably equivalent value" requirement.  (FAC ¶ 75.)

Additionally, the FAC pleads that at least two of the four Alleged Avoidable Transfers

were made pursuant to the January 2022 Initial Forbearance Agreement.  (*See id.* ¶ 44 (indicating

that the $5 million and $10 million payments made on April 29, 2022 and July 29, 2022,

respectively, were made pursuant to the January 2022 Initial Forbearance Agreement).)

Specifically, the January 2022 Initial Forbearance Agreement established a repayment schedule,

including requiring that at least (i) $5 million be repaid by April 30, 2022 and (ii) $10 million

repaid by July 31, 2022.  (January 2022 Initial Forbearance Agreement ¶ 1.)  That agreement

also provided GWA the sole option to "accelerate or make additional payments of principal at

any time." (*Id.*; *see also* September 2022 Initial Forbearance Agreement ¶ 1 (identical

language); July 2023 Initial Forbearance Agreement ¶ 1 (identical language).)

Notably, paragraph 5 of the January 2022 Initial Forbearance Agreement provides that

"[a]ll parties acknowledge and agree that they have received ***adequate and sufficient***

***consideration*** for entering into this [January 2022 Initial Forbearance] Agreement." (January

2022 Initial Forbearance Agreement ¶ 5 (emphasis added).) Identical language was included in

each of the other Initial Forbearance Agreements. (*See* September 2022 Initial Forbearance

Agreement ¶ 4; July 2023 Initial Forbearance Agreement ¶ 4.) This undercuts the Debtors'

contention that they received "less than what was bargained for" under Note Purchase

Agreements and Notes.

Accordingly, the Court **GRANTS** the Motion as to Count IX.

### 3.   Claims Seeking Contingent Relief

#### a.   *Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551*

The FAC asserts a claim pursuant to section 551 seeking to preserve the value of the

Alleged Avoidable Transfers for the benefit of the Debtors' estates. As discussed, such relief is

contingent, however, on a transfer having been avoided in the first instance pursuant to, among

others, sections 547 or 548 of the Bankruptcy Code. *See* 11 U.S.C. § 551.

In light of the dismissal of Counts VIII and IX, the Court **GRANTS** the Motion as to

Count X as well.

#### b.   *Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)*

The FAC also asserts a claim pursuant to section 550(a) of the Bankruptcy Code,

contending that the Debtors are entitled to (i) avoid the 2024 Forbearance Agreement and

(ii) recover from the Jefferies Entities an amount to be determined at trial of no less than $20

million plus interest and the costs of this action.  (FAC ¶ 146.)  This is warranted, the FAC

pleads, because the Debtors are entitled to avoid the Alleged Avoidable Transfers pursuant to

sections 547(b) and 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶ 144.)  Moreover, the Jefferies

Entities were "initial transferee[s] of one or more of the [Alleged] Avoidable Transfers, the

immediate or mediate transferee of such initial transferee, or the person for whose benefit one or

more of the [Alleged] Avoidable Transfers were made."  (*Id.* ¶ 145.)

Again, like Count X, relief under this Count is contingent on a transfer having been

avoided in the first instance pursuant to one of the enumerated provisions, including sections 547

and 548 of the Bankruptcy Code.  In light of the dismissal of Counts VIII and IX, the Court also

**GRANTS** the Motion as to Count XI.

### 4. Counts VIII, IX, X, and XI

For the reasons discussed, the Court **GRANTS** the Motion as to Counts VIII, IX, X, and

XI and **DISMISSES** the claims in their entirety.

### D.  Disallowance of the Jefferies Entities' Claims

The FAC asserts a claim pursuant to section 502(d) of the Bankruptcy Code that seeks

the disallowance of "any and all Claims of Defendants and/or their assignees, against the

Debtors' Chapter 11 estate or the Debtors" until the 2024 Forbearance Agreement is deemed

"null and void" and/or the Jefferies Entities pay all amounts sought for the Alleged Avoidable

Transfers.[22]  (*Id.* ¶ 151.)  The Jefferies Entities contend that dismissal of this claim is appropriate

as it is "premature and procedurally improper."  (Supporting Memorandum ¶ 70.)

Section 502(d) of the Bankruptcy Code provides, in relevant part, that:

> (d)     Notwithstanding subsections (a) and (b) of this section, the court
> shall disallow any claim of any entity from which property ***is recoverable***

---

[22]     The claims register reflects that the Jefferies Entities have filed proofs of claims in each of the Debtors'
bankruptcy cases.

> under section 542, 543, 550, or 553 of this title or that *is a transferee* of a
> transfer avoidable under section . . . 547 [or] 548 . . . of this title, unless such
> entity or transferee has paid the amount, or turned over any such property,
> for which such entity or transferee is liable under section 522(i), 542, 543,
> 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added).  Generally, this provision "automatically disallows the

claim of any entity that has received an avoidable transfer until the transfer is repaid." *In re*

*Wonderwork, Inc.*, 611 B.R. 169, 216 (Bankr. S.D.N.Y. 2020); *see also* 4 COLLIER ON

BANKRUPTCY ¶ 502.05 ("[Section 502(d)] requires disallowance of a claim of a transferee of a

voidable transfer *in toto* if the transferee has not paid the amount or turned over the property

received" as required under the enumerated sections "under which the transferee's liability

arises.").

Therefore, as relief under this Count is derivative of other causes of action that survive

the Motion (*i.e.*, Counts III, IV, and V in part), it would be premature to dismiss this claim at this

juncture.  *See, e.g.*, *Tese-Milner v. Lockton Cos. (In re Flywheel Sports Parent, Inc.)*, No. 20-

12157 (JPM), Adv. Pro. No. 22-01109 (JPM), 2023 WL 2245382, at *6 (Bankr. S.D.N.Y. Feb.

27, 2023) (concluding that dismissal of a section 502(d) claim would be premature as it is relief

that is a remedy derivative of other avoidance claims and is inapplicable until such claims are

liquidated).

### 1. Count XII

Accordingly, for the reasons discussed above, the Court **DENIES** the Motion as to Count

XII.

### E. Leave to Further Amend

The Debtors seek leave to replead any Counts in a further amended complaint to the

extent the Court dismisses any of Counts in the FAC.  (Opposition Brief at 25.)  Rule 15(a) of

the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of

Bankruptcy Procedure, generally provides that leave to amend a pleading should be "freely given when justice so requires." FED. R. CIV. P. 15(a)(2). Generally, the decision whether to allow an amendment is left to the "broad discretion" of the trial court judge. *See Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). "Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Rather, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Sherman v. Fivesky, LLC*, 19-cv-8015 (LJL), 2020 WL 5105164, at *1 (S.D.N.Y. Aug. 31, 2020) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). However, "[a] proposed amendment is . . . deemed futile if the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss." *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 58 (S.D.N.Y. 2017) (quoting *Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016)).

The Jefferies Entities oppose granting Debtors leave to further amend the FAC on grounds that the Debtors have (i) amended their complaint once already and (ii) provided no additional facts that they would seek to include. (Reply Brief ¶ 33.) However, the Debtors should be afforded an opportunity to amend the FAC and replead in accordance with and pursuant to the Court's ruling. While the Debtors have amended the complaint once before, the amendment was made before the complaint was subject to any Rule 12(b)(6) motion review. There is no suggestion of "bad faith" or "undue prejudice" on the part of the Debtors.

Accordingly, the Court **GRANTS** the Debtors' request for leave to further amend the FAC in accordance with the Court's ruling.

## IV.    CONCLUSION

For the reasons discussed, the Court **GRANTS** the Motion in part and **DENIES** the

Motion in part.  The Debtors may amend the FAC in accordance with the Court's ruling.

**IT IS SO ORDERED.**

Dated:  September 24, 2024
        New York, New York

                                        *Martin Glenn*
                                    _____
                                        MARTIN GLENN
                            Chief United States Bankruptcy Judge